# Illinois Official Reports

## Appellate Court

---

### *People v. Flowers*, 2015 IL App (1st) 113259

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JIMMY FLOWERS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-3259 |
| Filed | January 6, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The dismissal of defendant's supplemental postconviction petition arising from his convictions for first degree murder and aggravated battery with a firearm was affirmed, since defendant's claim that the evidence was "extremely close" because the first trial ended in a mistrial was unavailing in view of the evidence presented, which was sufficient to prove his guilt beyond a reasonable doubt; furthermore, defendant's petition should have been dismissed on untimeliness grounds, especially in view of the fact that he was required to file his petition within six months after the petition for leave to appeal date, June 1995, but the record showed the petition was filed 10 years later, in July 2005. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 91-CR-4819; the Hon. Mary Margaret Brosnahan, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Sarah Curry, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Matthew Connors, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Epstein and Ellis[1] concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant Jimmy Flowers filed a *pro se* postconviction petition for relief from judgment under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) relating to his convictions of first degree murder and aggravated battery with a firearm. The trial court appointed postconviction counsel to represent defendant. Thereafter, defense counsel filed a supplemental postconviction petition on defendant's behalf. The State filed a motion to dismiss the petition. After a hearing, the trial court granted the State's motion to dismiss, and dismissed defendant's postconviction petition. Defendant appeals, contending that the trial court erred in dismissing the petition where: (1) new evidence shows he was actually innocent of the crime; and (2) he was denied the effective assistance of trial counsel where counsel failed to investigate and call potential occurrence witness Karen Peterson. For the following reasons, we affirm.

¶ 2                                I. BACKGROUND
¶ 3    After a jury trial in 1993, defendant was found guilty of first degree murder and aggravated battery with a firearm for the 1991 shooting death of Dorian Thurmond and the shooting of Orlando Nash Porter. The trial court sentenced defendant to concurrent terms of 45 years' imprisonment for murder and 20 years' imprisonment for aggravated battery with a weapon.

¶ 4    The following facts were adduced at trial.[2]

¶ 5    At trial, surviving victim Orlando Nash Porter testified that, at approximately 9 p.m. on January 18, 1991, he left his house at 7203 South Wood Street in Chicago to walk to his friend Kendall's house nearby. When he arrived at his destination at 7137 South Hermitage Avenue, he knocked on the door. Nobody answered. He then went down the stairs of the front porch. He saw Eddie Beaver across the street. Porter called out to Beaver, asking him to

_____

[1]This opinion was originally filed as a Rule 23, joined by Justices Epstein and Taylor. Justice Taylor has since retired from this court. Justice Ellis now joins in this opinion.

[2]Defendant's first trial ended in a mistrial. The facts included here are adduced from defendant's second trial, which ended in a guilty verdict on both the murder and aggravated battery with a firearm charges.

come across the street because Beaver might know which window to knock on to alert somebody inside. Beaver complied. After Beaver knocked on the window, a person came to the door. Beaver left and Porter went inside briefly. He did not stay long because the friend for whom he was looking, Joe, was not there. As Porter left the house, he saw two men on the same side of the street as he was, about three or four houses away. At that time, Porter was standing beneath an illuminated streetlight. However, he could not see the facial features of the two men because it was nighttime and they were not under the streetlight, but were instead between the streetlight on the corner and the streetlight where Porter was standing. Porter testified he did not recognize either of the two men. He continued walking, and as he came within two houses of them, he saw both men draw weapons and begin shooting. One man was shooting at Porter and the other man was shooting "at an angle." Porter fled, jumping over a nearby fence. As he ran, he fell repeatedly and realized he had been shot in the knee. He could hear more gunshots. Porter ran to a friend's house, where his friend's aunt put gauze on the wound and called an ambulance.

¶ 6    Porter was treated at the hospital for a gunshot wound to the knee. Porter testified that he had lived in the neighborhood his whole life. He did not know defendant before that night and had never seen him in the neighborhood.

¶ 7    Gregory Bridges testified he lived in a house across the street from the scene of the shooting. On the night of the shooting, he was outside on his front porch with his friends, Eddie Beaver and Dorian Thurmond. From his porch, he watched defendant, whom he had known for two years, and an unidentified man walk down the street. When the two men were about two houses away on the other side of the street, Bridges saw them each draw a handgun. When they were about one house away, Bridges testified they "started shooting at some of my friends." He could see that each of the two men had a handgun, could see "fire coming from the guns" when they were fired, and could hear the gunshots. Bridges also saw Porter exit a house and start walking down the street. He then watched as the men shot at Porter. He saw Porter jump a nearby fence to get away, and then the shooters turned their guns on Bridges, Beaver, and Thurmond. At the time of the shooting, Thurmond was in the gangway on the north side of Bridges' house, while Bridges and Beaver were on the porch. Bridges tried to get back into his house, but the door was locked. He and Beaver took shelter behind a pillar on the porch from which they were able to look out and watch defendant and the unidentified man shooting. After the shooting, Bridges saw defendant and the other man run through a vacant lot heading east. Bridges testified that the men were running in the direction of defendant's house, which was on the next street over. Although it was nighttime, there were illuminated streetlights in the area, including directly across the street from Bridges' house.

¶ 8    After the shooting, Bridges found Thurmond on the ground in the gangway with blood coming from his jaw. Bridges called for an ambulance. Bridges spoke to responding police officers in front of his house for a few minutes, but he did not tell the officers who shot Thurmond and did not tell them defendant was one of the shooters. Bridges testified he gave the police a description of the individuals. Some detectives arrived at Bridges' house later that evening, after the ambulance and police left. Bridges testified that the detectives picked him up at his home and drove him to the police station. Bridges testified he named defendant as the shooter while he was sitting in the detectives' car. On their way to pick up Beaver at Beaver's house, Bridges showed the detectives where defendant lived. While at the police station, Bridges again told police that defendant was one of the individuals who shot

Thurmond. Bridges gave a statement at the police station. Bridges identified defendant as the shooter in open court.

¶ 9    Eddie Beaver testified as an eyewitness to the shooting. Beaver testified he was at Bridges' house most of the day of the shooting. At approximately 9 p.m., he was on Bridges' porch and saw Porter go to Kendall's house. Porter motioned for Beaver to come over, asking Beaver to knock on a window so Porter could get into the house. After Beaver did so, Porter entered the house and Beaver returned to Bridges' house across the street. Thurmond arrived soon after, but did not come up on the porch. As Beaver and Thurmond talked, Beaver saw two men turn the corner onto Hermitage Avenue and walk down the east side of the street. Beaver recognized one of the men as defendant, whom he had known for about a year from seeing him in the neighborhood. Beaver saw Porter exit Kendall's house and begin to walk down the block when the two men started shooting at him. Porter ran and jumped a fence. Then the men turned and started shooting at Beaver, Bridges and Thurmond. Beaver testified he did not hear the men say anything to Porter before they started shooting. Beaver ducked behind a pillar on the porch during the shooting, but could look out to see where the shooters were. There was an illuminated streetlight by Kendall's house. Beaver watched as the two shooters fled through a vacant lot.

¶ 10    After the shooting, Beaver found Thurmond on the ground in the gangway and could see blood coming from his nose and mouth. The police and ambulance arrived. Beaver testified that, when the police arrived, they put everybody against a fence to "check them" and then told everybody to go home. Beaver did not talk to the police at that time because he was told to go home. Around midnight that night, police came to his house with Bridges in their car. They took Bridges and Beaver to the police station and questioned them about what happened when Thurmond was shot. Beaver testified he was questioned by detectives, interviewed by an assistant State's Attorney, and that he gave a written statement. Beavers identified defendant as the shooter in open court.

¶ 11    Chicago police detective John Ball testified he and his partners investigated the shooting in question. That night, while at Bridges' house, they learned Bridges and Beaver were witnesses to the homicide. Bridges also told them defendant was the shooter. As they drove from Bridges' house to Beaver's house, Bridges showed them defendant's house. After they picked up Beaver, both Beaver and Bridges showed them where defendant lived and told them defendant was the shooter. They again named defendant as the shooter when they were at the police station.

¶ 12    The State rested. Defendant filed a motion for a directed verdict, which the trial court denied.

¶ 13    Defendant testified on his own behalf. He testified that he knew Bridges, Beaver, and Porter from the neighborhood. Prior to January 18, 1991, defendant had never had an argument with the three men. Defendant denied he shot Porter and Thurmond. He admitted he had a conviction for possession of a controlled substance with intent to deliver from 1990.

¶ 14    Defendant's uncle, Michael Brooks, testified that he and several family members lived with defendant at the time of the shooting. On the night of the shooting, Brooks went to his girlfriend's house and saw Porter on the floor, bleeding from the leg. Brooks admitted he did not tell the police or detectives about this.

¶ 15    Robert Wren, defendant's neighbor, testified he heard several gunshots on the night of the shooting while he was standing inside defendant's kitchen. Wren was unable to remember at what time he heard the gunshots.

¶ 16　　Carolyn Brown testified that, on the night of the shooting, she heard several gunshots that sounded like they were coming from just beneath her bedroom window at 7141 South Hermitage. She had been watching television in bed at approximately 9 p.m. when she heard a car screech and then immediately heard gunshots. She rolled out of bed and onto the floor, staying there for a few minutes. Brown estimated she heard around 50 gunshots, describing them as rapid shots from more than one gun, from a mixture of handguns and shotguns, with some extremely close and some a little distance away.

¶ 17　　After the shots stopped, Brown called the police. She then looked out the window, which looked out onto an enclosed front porch that led outside. Brown testified she saw Kendall, her neighbor, coming toward the front of her house. It appeared to her that Kendall was coming from her gangway. Brown testified that Kendall was carrying a sawed-off shotgun in his hand. She did not see Kendall shoot at anybody. She also testified that there were approximately six other young men coming from in front of Kendall's house. Brown testified that she later watched police picking up shotgun shells from her yard. Brown did not see the shooting itself.

¶ 18　　The defense rested. After closing arguments, the jury found defendant guilty of first degree murder and guilty of aggravated battery with a firearm. At sentencing, the court sentenced defendant to 45 years' incarceration for murder and 20 years' incarceration for aggravated battery with a weapon, to be served concurrently.

¶ 19　　On direct appeal to this court, defendant contended he was not proven guilty beyond a reasonable doubt and that his sentence for murder was excessive. This court rejected both arguments and affirmed defendant's convictions and sentences, finding: "The record shows that the evidence, including the identification evidence, was sufficient to prove defendant's guilt beyond a reasonable doubt (*People v. Slim* (1989), 127 Ill. 2d 302, 307-08, 537 N.E.2d 317), and the trial court did not abuse its discretion in sentencing defendant to 45 years for murder (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882)." *People v. Flowers*, No. 1-93-3415 (1994) (summary order).

¶ 20　　Thereafter, defendant filed a *pro se* petition for postconviction relief on July 28, 2005, alleging that there was newly discovered evidence to establish his actual innocence. Defendant attached an affidavit to the petition from Dujuan McCray, in which McCray averred that on the evening of January 18, 1991, he lived at 7126 South Hermitage. That night, he was at a party at Kendall Pruitt's house at 7139 S. Hermitage, and:

> "5. While at this party Dorian Thurman came into the house and asked for a gun.
>
> 6. I asked him, why he needed a gun? and he stated he was outside alone, so I gave him a 380 semiautomatic handgun.
>
> 7. Dorian Thurman then returned outside to the porch and 3 or 4 minutes later, I heard gun shots and ran outside and seen two black men running north on 71st and Hermitage past Kendall Pruitt's house.
>
> 8. One of the black men that I seen was Lamont Taylor, which I knew because his cousin Antonio Taylor lived two houses down from Kendall Pruitt house, and he was always over Antonio Taylor house.
>
> 9. I seen the other man's face, but I did not know his name.
>
> 10. At no time did I see Jimmy Flower a.k.a Twon running toward 71st & Hermitage, or in the neighborhood on the night of January 18, 1991.

11. As the two men ran past me going toward 71st and Hermitage, Gregory Bridges yelled across the street saying that Dorian Thurman was in the [gangway] of 7148 S. Hermitage shot in the face.

12. Dorian Thurman uncle Joe Brown stayed in the [gangway] with him waiting for the ambulance to arrive.

13. I left the seen of the shooting, but at no time did any police question or interview me about what I seen on the night of January 18, 1991.

14. That if the police would have interviewed me, I would have told them the same thing, I've said in this affidavit."

¶ 21    The court appointed counsel to represent defendant. Counsel filed a supplemental postconviction petition in June 2010. By that petition, defendant argued first that he was actually innocent, and second that he received ineffective assistance of counsel where his trial counsel failed to present the exculpatory testimony of Karen Peterson. In support of his actual innocence claim, counsel attached a second affidavit from Dujuan McCray. In support of his ineffective assistance of counsel claim, counsel attached an affidavit from Karen Peterson and an affidavit from defendant. In McCray's second affidavit, McCray averred:

"1. I was witness to a shooting incident which occurred on January 18, 1991, that resulted in the death of Dorian Thurman and the wounding of Orlando Nash Porter. I heard gunshots and ran outside, and saw two black men running north on Hermitage Street past Kendall Pruitt's house. They were both carrying guns. Neither one of them was Jimmy Flowers, nor did I see him in the vicinity.

2. I had no idea that Jimmy Flowers had been charged and convicted in connection with the January 18, 1991, shooting until 2002 or 2003.

3. I was never interviewed about the case at the time. I never spoke with any police officers or attorneys regarding the case.

4. The first time that I learned Flowers was charged and convicted in the case was when we were both locked up in Pinckneyville Correctional Center. We had a conversation where Flowers told me that he had been convicted. I agreed to sign an affidavit stating what I knew about the incident, and did so on July 29, 2003."

¶ 22    In defendant's affidavit, he averred, in pertinent part:

"My attorney's name was Nathaniel R. Howse Sr. He was retained as my attorney in Jan. 1991, up until Sept, Oct. 1992. Together we discussed the police reports and potential witnesses we could call to testify. One witness Karen Brown, we thought, could provide the help we would need.

My attorney went to Miss Brown's house to see if she would in fact provide any additional information about the night in question. I was told by my attorney [that] she said, she did in fact see what happen that night and she knew that I was not the one who shot and killed the victim that night, but she didn't want to testify because she and her mom feared for her life. So Karen's mom Carolyn Brown offered to testify instead.

During my stay in the Cook County Jail, I was put on the same living unit as Kendall Pruitt. (Approx 8 months to a year in my stay). In Division Six-Two-N. He asked, 'why are you still in jail for that?' 'Everybody that was there that night knew it wasn't really you.' I asked if he would testify to that and he replied, 'They would kill me if I did.'

- 6 -

Kendall and I have known one another since grammar school.

Dujuan McCray and I were in the same institution in 2002. Pinckneyville Corr. Center. He and I have also known one another since grammar school. I never knew he was there the night in question, and he never told the police his name, to be a witness. He asked why I was locked up and I started to explain, and he gave me a shocked ! look and stopped me from talking. Then he explained to me, what really happened the night Dorian Thurmond was killed.

I asked if he would be willing to testify and put his words in an affidavit and he said yes and wrote what he saw.

I wanted to wait until I could contact Karen Brown to further my quest in knowing the truth and have potentially two new witnesses, but after numerous attempts to contact her or the family, I came to a dead end.

That's why I didn't file this sooner.

On the night in question I was at my grandmother's house 7121 S. Paulina. My uncle and I were having a small party with neighbors. We were interrupted by the sounds of sirens, and lights flashing. So we all went to the front porch to see where they were going, when the ambulance stopped, aprox. 4 houses from our house. We stood and watched as the paramedics carried someone on a stretcher to the ambulance. We didn't know who was on the stretcher, or what happened, until Lelah Green, a neighbor, and a resident of the house form which the ambulance came, returned to my house and explained that her son's childhood friend had been shot and went to her house, but he would be O.K. We returned back to our affairs. My uncle Michael Brooks and one of my neighbors Robert Wren were there to testify to that."

¶ 23    By her affidavit, which was presented in support of defendant's ineffective assistance of trial counsel claim, Karen Peterson averred:

"1. On January 18, 1991, I was 16 years of age. I lived with my mother, Carolyn Jones, at 7141 S. Hermitage, in Chicago.

2. At around 9:00 p.m. on that date, I noticed two black males walking around the vicinity of my house. They walked around the block two or three times, and it appeared they were looking for someone.

3. I was standing in front of my home at this time.

4. One of the two men pulled out a gun and began shooting at Dorian Thurmond, who was standing near the house at 7148 S. Hermitage. I saw that Dorian was struck by the gunfire and was lying on the ground. The two men ran off in the direction of 72nd Street.

5. I had known Jimmy Flowers for years, because we lived in the same area.

6. The two men were wearing hoodies, and I did not recognize either of them. I could tell that neither of the men was Jimmy Flowers. They had a darker complexion, and a different body type.

7. I spoke with the police shortly after the incident. I do not recall specifically what information I gave them.

8. Several weeks after the shooting, I had a conversation with some members of Jimmy Flowers's family. I was surprised to learn that he had been arrested and charged with the murder. I told them that I did not know why he had been arrested,

and that I had seen that Jimmy was not involved. I told them I would be willing to testify about this at trial.

9. In 1992, I spoke with members of Jimmy's family when I saw them at a memorial service for Jimmy's grandmother. I told them again that I would be willing to testify in court about what I had seen.

10. I was never contacted by an attorney or investigator working for Jimmy Flowers at any time. I did not attempt to contact an attorney or investigator working for Jimmy Flowers.

11. From the date of the shooting through early 1996, I lived with family members or by myself in the Chicago area. During this time, I was in contact with friends and family members. These friends and family members knew where I lived and how to contact me.

12. I lived in the Chicago area through early 1996. At that time I joined the military and served overseas until June 1998. On my return, I lived in Kentucky for a few months. I lived in a number of locations during the period December, 2008 through the present: (Calumet City, Illinois (fall 1998-December 2000); East Chicago, Indiana (December 2000-December 2002); military service in Illinois (January 2003-April 2003); Chicago, Illinois (April 2003-September 2003); Piper City, Illinois (September 2003-January 2004); Chicago, Illinois (January 2004-April 2005); and Louisville, Kentucky (April 2005-present)."[3]

¶ 24 The State filed a motion to dismiss the petition in December 2010. In September 2011, the court granted the motion to dismiss, finding that the information contained in McCray's affidavit was not newly discovered and that McCray's testimony would not change the result on retrial. The court also found that, while the delay in bringing forth his ineffective assistance claim was not due to defendant's culpable negligence, he failed to demonstrate that trial counsel was ineffective for failing to call Peterson as a witness.

¶ 25 Defendant appeals.

## II. ANALYSIS
### A. Actual Innocence

¶ 28 On appeal, defendant first contends that the postconviction court erred in dismissing his postconviction petition where he made a substantial showing of actual innocence. Specifically, defendant argues that an evidentiary hearing is warranted where alleged newly discovered evidence from occurrence witness Dujuan McCray shows that defendant was not involved in the shooting.

¶ 29 We begin by noting the well-established principles regarding postconviction proceedings. The Act provides a means by which a defendant may challenge his conviction for "substantial deprivation of federal or state constitutional rights." *People v. Tenner*, 175 Ill. 2d 372, 378 (1997); *People v. Jones*, 213 Ill. 2d 498, 503 (2004); see also *People v. Coleman*, 206 Ill. 2d 261, 277 (2002). A postconviction action is a collateral attack on a prior conviction and sentence and " 'is not a substitute for, or an addendum to, direct appeal.' " *People v. Simmons*, 388 Ill. App. 3d 599, 605 (2009) (quoting *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994)).

---

[3]Inserted at this point with no explanation as to who wrote it is a handwritten addition: "Elgin, Ill April 2008-May 2009 Normal, Ill May 2009-December 2009".

¶ 30    Proceedings under the Act are commenced by the filing of a petition in the circuit court in which the original proceeding took place. *Jones*, 213 Ill. 2d at 503. The Act creates a three-stage process. *People v. Makiel*, 358 Ill. App. 3d 102, 104 (2005). At the first stage of postconviction proceedings, the circuit court must determine whether the petition is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010); *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At this stage, to proceed further, the allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim. *People v. Harris*, 224 Ill. 2d 115, 126 (2007). This standard presents a "low threshold" (*People v. Jones*, 211 Ill. 2d 140, 144 (2004)), requiring only that the defendant plead sufficient facts to assert an arguably constitutional claim (*People v. Hodges*, 234 Ill. 2d 1, 9 (2009)). Accordingly, the trial court may summarily dismiss a petition as "frivolous and patently without merit" only where the petition "ha[s] no arguable basis either in law or in fact, *i.e.*, whether it was based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 17.

¶ 31    Where, as here, a petition advances to the second stage of the postconviction process, the State may file a motion to dismiss. 725 ILCS 5/122-5 (West 2010). To survive such motion, a petitioner must make a "substantial showing" that his constitutional rights were violated by supporting his allegations with the trial record or appropriate affidavits. *People v. Simpson*, 204 Ill. 2d 536, 546-47 (2001). At the second stage of proceedings, all well-pleaded facts that are not positively rebutted by the trial record are taken as true. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). An evidentiary hearing is only required when the allegations of the petition, supported by the trial record and accompanying affidavits, make a substantial showing of a violation of a constitutional right. *People v. Hobley*, 182 Ill. 2d 404, 427-28 (1998). We review a circuit court's dismissal of a postconviction petition at the second stage *de novo*. *People v. Lofton*, 2011 IL App (1st) 100118, ¶ 28.

¶ 32    Here, defendant contends he established his actual innocence based on newly discovered evidence where an eyewitness to the shooting presented affidavits in which he attested that defendant was not the shooter. The wrongful conviction of an innocent man violates due process. *People v. Washington*, 171 Ill. 2d 475, 481 (1996). The due process clause of the Illinois Constitution allows a prisoner to present a freestanding claim of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 331-32 (2009); *People v. Burrows*, 172 Ill. 2d 169, 179 (1996) (a proper claim under the Act may include a claim of actual innocence based on newly discovered evidence).

¶ 33    The focus of a freestanding claim of actual innocence is on the new evidence itself and whether it would totally vindicate or exonerate the defendant. *People v. Anderson*, 401 Ill. App. 3d 134, 140 (2010). At the second stage of a postconviction "actual innocence" inquiry, the relevant question is "whether the petitioner has made a substantial showing of actual innocence such that an evidentiary hearing is warranted." *Lofton*, 2011 IL App (1st) 100118, ¶ 34. Newly discovered evidence cannot be used to relitigate the sufficiency of the evidence adduced at trial. *People v. Coleman*, 2013 IL 113307, ¶ 97 ("Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial."). The evidence supporting a claim of actual innocence must be newly discovered, material and not merely cumulative, and of sufficiently conclusive character that it would probably change the result of a retrial. *People v. Edwards*, 2012 IL 111711, ¶ 32. Our supreme court recently explained:

"Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.] And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]" *Coleman*, 2013 IL 113307, ¶ 96.

¶ 34    Even if we were to find that this evidence was newly discovered, defendant's claim fails because it is neither material nor conclusive. See *Coleman*, 2013 IL 113307, ¶ 96 ("Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] *** And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. [Citation.]"). Defendant argues, "Flowers' trial would have been much different if the jury had heard McCray's testimony that he knew Flowers, that he saw the shooters, and that neither of the shooters was Flowers." This, however, is not what the affidavits on which defendant relies show McCray's testimony would be. Neither affidavit indicates that McCray actually witnessed the shooting. A close reading of McCray's affidavits reveals that McCray was not, in fact, a witness to the shooting. McCray does not attest that he saw the shooters, nor that neither of the shooters was Flowers. Instead, McCray attests that, *after the shooting*, he saw two men with weapons, neither of whom was defendant. McCray did not attest that he saw the actual shooting, but only the aftermath of the shooting.

¶ 35    The most we can garner from a liberal reading of McCray's affidavits is that he provided a weapon to the victim prior to the shooting. The victim then went outside, and McCray remained inside. McCray was inside the house during the shooting and did not see the shooting. Then, in the moments following the shooting, McCray emerged from the house and saw two armed men running down the street, neither of whom was defendant. We cannot extrapolate from this that defendant was not the shooter. Rather, from this affidavit, we essentially know only that McCray did not see defendant in the aftermath of the shooting. This evidence is neither relevant nor probative of defendant's innocence, nor, if offered, would it be likely to lead to a different result at trial.

¶ 36    At trial, the evidence of defendant's guilt was strong, where multiple individuals testified they saw defendant shoot the victims on the night in question. Porter testified he saw two men, each armed, shoot at him and at a group of men across the street. Porter jumped over a fence and fled. Bridges testified he saw defendant, whom he had known for two years, and another, unidentified man each draw a weapon and shoot at Porter. Bridges also testified that he personally saw fire coming from each weapon and heard the gunshots. Bridges testified that, after shooting Porter, defendant and the other man turned their weapons on Bridges, Beaver, and Thurmond, shooting at them and killing Thurmond. Beaver testified to a similar set of circumstances, also identifying defendant, whom he had known for a year, as the shooter. The area in which both men witnessed the shooting was illuminated by a streetlight.

¶ 37    McCray's affidavits, which clearly state that he did not see the actual shooting, but only the aftermath of the shooting ("I heard gun shots and ran outside, and saw two black men running north on Hermitage Street past Kendall Pruitt's house. They were both carrying

guns. Neither one of them was Jimmy Flowers, nor did I see him in the vicinity."), are insufficient to move this petition to a third-stage evidentiary hearing. These documents do not support defendant's claim of actual innocence where, at most, they show that McCray was not at the scene of the shooting and has no personal knowledge about the shooting itself. See *People v. Gillespie*, 407 Ill. App. 3d 113, 135 (2010) ("These affidavits merely affirm that neither of these individuals has any personal knowledge concerning the *** murder and, therefore, cannot support defendant's claim of actual innocence."). We find no error in the postconviction court's decision to dismiss this petition.

¶ 38 Defendant's assertion that the evidence was "extremely close" because the first trial ended in a mistrial is unavailing. This court has previously reviewed the evidence on direct appeal and found "[t]he record shows that the evidence, including the identification evidence, was sufficient to prove defendant's guilt beyond a reasonable doubt." *People v. Flowers*, No. 1-93-3415 (1994) (summary order). Moreover, an actual innocence postconviction claim is not an appropriate vehicle to relitigate the sufficiency of the evidence adduced at trial. See *Coleman*, 2013 IL 113307, ¶ 97 ("Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial."). We find no error in the dismissal of defendant's claim of actual innocence.

¶ 39                          B. The Ineffective Assistance of Trial Counsel Claim
¶ 40 Defendant next contends that the second-stage dismissal of his petition must be reversed because his pleadings and affidavits substantially established he was deprived of the effective assistance of trial counsel. Defendant specifically maintains that his trial counsel was ineffective for failing to interview and call eyewitness Karen Peterson.

¶ 41 To establish a claim of ineffective assistance of counsel, a defendant must show that (1) his attorney's representation fell below an objective standard of reasonableness; and (2) he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Coulter*, 352 Ill. App. 3d 151, 157 (2004). To satisfy the first prong, a defendant must overcome the presumption that contested conduct which might be considered trial strategy is generally immune from claims of ineffective assistance of counsel. *People v. Martinez*, 348 Ill. App. 3d 521, 537 (2004); *People v. Burks*, 343 Ill. App. 3d 765, 775 (2003). Failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. *People v. Palmer*, 162 Ill. 2d 465, 475-76 (1994). Effective assistance of counsel in a constitutional sense means competent, not perfect, representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). Courts indulge in the strong presumption that counsel's performance fell within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 690; *People v. McGee*, 373 Ill. App. 3d 824, 835 (2007). "Based on the second-stage procedural posture of the instant case, the relevant question is whether the allegations of the petition, supported by the trial record and the accompanying affidavits, demonstrate a substantial constitutional deprivation which requires an evidentiary hearing." *Makiel*, 358 Ill. App. 3d at 106 (citing *People v. Coleman*, 183 Ill. 2d 366, 381 (1998)).

¶ 42 Here, we must first resolve the important threshold matter of whether this petition should be dismissed on untimeliness grounds pursuant to section 122-1 of the Act. The State contends and defendant concedes that his petition is untimely. Defendant argues that although his original filing was not timely brought, this untimeliness should be excused because he was not culpably negligent for the delay. Specifically, defendant asks this court to

determine that Peterson moved so frequently that, through no fault of his own, he was unable to obtain her affidavit previously.

¶ 43    Under section 122-1 of the Act, a postconviction proceeding may not be commenced outside the time limitation period stated in the Act unless the defendant alleges sufficient facts to show that the delay in filing his initial petition was not due to his culpable negligence. 725 ILCS 5/122-1(c) (West 2010); *People v. Rissley*, 206 Ill. 2d 403, 420-21 (2003). Section 122-1(c) of the Act provides in pertinent part:

> "no proceedings under this Article shall be commenced more than 6 months after the conclusion of proceedings in the United States Supreme Court, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence. If a petition for certiorari is not filed, no proceedings under this Article shall be commenced more than 6 months from the date for filing a certiorari petition, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence.
>
>     *** If a defendant does not file a direct appeal, the post-conviction petition shall be filed no later than 3 years from the date of conviction, unless the petitioner alleges facts showing that the delay was not due to his or her culpable negligence." 725 ILCS 5/122-1(c) (West 2010).

¶ 44    Our supreme court has defined culpable negligence as "contemplat[ing] something greater than ordinary negligence and is akin to recklessness." *People v. Boclair*, 202 Ill. 2d 89, 106, 108 (2002) ("Culpable negligence has been defined as '[n]egligent conduct that, while not intentional, involves a disregard of the consequences likely to result from one's actions.' Black's Law Dictionary 1056 (7th ed. 1999). Culpable negligence has also been defined as 'something more than negligence' involving 'an indifference to, or disregard of, consequences.' 65 C.J.S. *Negligence* § 19 (2000)."). Our supreme court has made clear that it is imperative to construe "culpable negligence" broadly so as to ensure that defendants will not be unfairly deprived of the opportunity to have their constitutional claims adjudicated. *Rissley*, 206 Ill. 2d at 420-21.

¶ 45    A petitioner asserting he was not culpably negligent for the tardiness of his petition must support his assertion with allegations of specific facts showing why his tardiness should be excused. *People v. Walker*, 331 Ill. App. 3d 335, 339-40 (2002) (noting that the relevant inquiry becomes whether, after accepting all well-pleaded factual allegations of the defendant's petition regarding culpable negligence as true, those assertions are sufficient as a matter of law to demonstrate an absence of culpable negligence on defendant's part). While not dispositive, the length of the delay in filing may suggest recklessness on a defendant's part. *People v. Hampton*, 349 Ill. App. 3d 824, 828 (2004). "A trial court's findings of fact regarding whether a petition's untimeliness was due to culpable negligence will not be reversed unless manifestly erroneous (*People v. Caballero*, 179 Ill. 2d 205, 214 (1997)), but the trial court's ultimate conclusion as to whether the established facts demonstrate culpable negligence is reviewed *de novo* (*People v. Wilburn*, 338 Ill. App. 3d 1075, 1077 (2003))." *People v. Ramirez*, 361 Ill. App. 3d 450, 452 (2005).

¶ 46    Defendant here claims that, because Peterson moved numerous times between 1996 and 2010, he was not culpably negligent for his failure to obtain her affidavit. On appeal, he argues: "[Defendant] attested that he made numerous attempts over the years to get in touch with Peterson, but he came to a dead end. Peterson confirmed that she moved repeatedly

- 12 -

between 1996 and 2010, including out of Illinois and even out of the country, making it difficult for someone to get in touch with her. Because the delay in raising this issue was not due to [defendant's] culpable negligence, this Court may address the issue on the merits." However, in closely reviewing the affidavits here, we find that defendant's argument fails. Instead, it is clear from Peterson's affidavit that she knew defendant from the neighborhood, that she and her potential testimony were known to defendant, and defendant could have located her. Specifically, she averred that she spoke with police shortly after the incident. She also averred she spoke with defendant's family shortly after the shooting:

> "Several weeks after the shooting, I had a conversation with some members of Jimmy Flowers's family. I was surprised to learn that he had been arrested and charged with the murder. I told them that I did not know why he had been arrested, and that I had seen that Jimmy was not involved. I told them I would be willing to testify to this at trial."

¶ 47    Additionally, she averred that she spoke with Jimmy's family again in 1992:

> "In 1992, I spoke with members of Jimmy's family when I saw them at a memorial service for Jimmy's grandmother. I told them again that I would be willing to testify in court about what I had seen."

¶ 48    She also averred that she lived in Chicago and was available through early 1996:

> "From the date of the shooting through early 1996, I lived with family members or by myself in the Chicago area. During this time, I was in contact with friends and family members. These friends and family members knew where I lived and how to contact me."

¶ 49    Defendant acknowledges that his trial counsel visited Peterson's house prior to trial,[4, 5] spoke with Karen, and discovered that Karen "did in fact see what happen that night and she knew that I was not the one who shot and killed the victim that night." Karen did not, however, want to testify because she and her mother feared for her life. Instead, Karen's mother Carolyn testified. Then, defendant met up with McCray in prison in 2002. McCray offered to testify on defendant's behalf. Defendant offers only the following explanation as to why he did not secure an affidavit from Karen in a timely manner:

> "[In 2002, after finding out McCray would testify on my behalf,] I wanted to wait until I could contact Karen Brown to further my quest in knowing the truth and have

---

[4]The two women here, Karen Brown and Carolyn Jones, appear to have multiple names. Karen Brown appears to be Karen Peterson, daughter of Carolyn Jones, also known as Carolyn Brown, who testified at trial.

[5]There are inconsistencies between defendant's and Peterson's affidavits. Defendant avers that his trial counsel visited Peterson at her house "to see if she would in fact provide any additional information about the night in question. I was told by my attorney [that] she said, she did in fact see what happen that night and she knew that I was not the one who shot and killed the victim that night, but that she didn't want to testify because she and her mom feared for her life. So Karen's mom Carolyn Brown offered to testify instead." Peterson, on the other hand, averred that, while she witnessed the shooting, knew defendant was not involved in the shooting, was in regular contact with defendant's family, and was willing to testify for defendant, she was never asked to do so ("I was never contacted by an attorney or investigator working for [defendant] at any time. I did not attempt to contact an attorney or investigator working for [defendant].").

- 13 -

potentially two new witnesses, but after numerous attempts to contact her or the family, I came to a dead end.

    That's why I didn't file this sooner."

¶ 50    On appeal, defendant explains:

    "The State argues that [Karen] did not move out of the area until after [defendant's] petition should have been filed. However, it was not until after Flowers was housed at Pinckneyville Correctional Center with McCray and learned that McCray was a witness to the shooting, and knew that [defendant] was not present at the shooting, that [defendant] felt he needed to acquire an affidavit from [Karen] as well."

¶ 51    While this may be true, it does not excuse defendant's culpable negligence in this instance. See *Walker*, 331 Ill. App. 3d at 339 (To demonstrate freedom from culpable negligence, a petitioner "must support his assertion of no culpable negligence with allegations of specific fact showing why his tardiness should be excused."). Defendant was required to file his petition within six months after the petition for leave to appeal date, or June 1995. Instead, defendant filed his petition 10 years later, in July 2005. Peterson specifically averred that she was in the Chicago area and contactable until early 1996, months after the date for filing the petition ("From the date of the shooting though early 1996, I lived with family members or by myself in the Chicago area. During this time, I was in contact with friends and family members. These friends and family members knew where I lived and how to contact me."). Defendant's claim that Peterson's movements, occurring after his petition should have been filed, excuse the delay in the filing of that petition is unavailing. In addition, by the express terms of her affidavit, Peterson admitted she was known to defendant and had multiple conversations with his family before the trial, outlining the same information that is contained in her affidavit. Where Peterson was known to defendant and had multiple conversations with his family before defendant's trial, discussing the precise information at issue, that is, her eyewitness testimony, with them, and she was available in the Chicago area during the time period before defendant's postconviction petition was due, we find this court is unable to excuse defendant's culpable negligence in the untimely filing of this claim. This claim was properly dismissed.

¶ 52                         III. CONCLUSION

¶ 53    For all of the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 54    Affirmed.