2020 IL App (1st) 162632-U

No. 1-16-2632

Order filed February 6, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 CR 15877 |
| | ) | |
| THEOPOLIS WILLIAMS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Where the affidavit supporting defendant's postconviction claim of actual innocence is not of such conclusive character that it would probably change the result if a new trial were granted, the trial court did not err in dismissing the petition on motion of the State.

¶ 2    Defendant Theopolis Williams, who was convicted of two counts of aggravated battery with a firearm, appeals from the trial court's second-stage dismissal of his petition for relief pursuant to the Post-Conviction Hearing Act. 725 ILCS 5/122-1 *et seq.* (West 2012). On appeal,

defendant contends that the petition made a substantial showing of actual innocence based on newly discovered evidence, *i.e.*, an affidavit in which a man named Mark Williams averred that another person had confessed to the shooting. For the reasons that follow, we affirm.

¶ 3    Defendant's conviction arose from the May 21, 2002, shooting of Jermaine Henderson and six-year-old Sergio Jacquez in Chicago. Following their arrests, defendant and codefendant Caston Rollins were charged by indictment with numerous counts of attempted first degree murder and aggravated battery with a firearm, as well as aggravated battery of a child, aggravated discharge of a firearm, and unlawful use of a weapon by a felon. Prior to trial, the State nol-prossed all but two counts of aggravated battery with a firearm. Those counts alleged that defendant and Rollins caused injury to the victims by discharging firearms and shooting the victims about the body.

¶ 4    Defendant and Rollins were tried at a simultaneous bench trial in 2003. Defendant was convicted of two counts of aggravated battery with a firearm and sentenced to two concurrent terms of 24 years' imprisonment.[1] On direct appeal, this court corrected the mittimus and remanded for the trial court to assess the merits of defendant's *pro se* posttrial allegation that he received ineffective assistance of trial counsel. *People v. Williams*, No. 1-04-0962 (2005) (unpublished order under Supreme Court Rule 23). On appeal following that remand, we affirmed and ordered further correction of the mittimus. *People v. Williams*, No. 1-06-1424 (2007) (unpublished order under Supreme Court Rule 23). In our orders, we summarized the underlying facts of the case. Due to the nature of defendant's current claim, those facts, along with other background information, will be repeated here in more detail.

---

[1] Rollins was also found guilty of two counts of aggravated battery with a firearm and was sentenced to concurrent terms of 30 years in prison. He is not a party to this appeal.

¶ 5     Prior to trial, defense counsel filed a petition for a writ of *habeas corpus ad testificandum*, seeking to compel the Illinois Department of Corrections to produce Mark Williams to testify at defendant's trial. On the date referenced in the petition, Mark Williams was brought to the courtroom. The following exchange ensued:

> "THE COURT: You are who, sir?
>
> THE WITNESS: Mark Williams.
>
> THE COURT: [Defense counsel], is this the witness you subpoenaed to be brought in regarding the defendant?
>
> [DEFENSE COUNSEL]: Yes, Judge. I am in the process of interviewing him to determine whether he really can be a witness on Wednesday. If I could continue that interview for just a couple of minutes. It doesn't look like it is going towards him being a witness.
>
> THE COURT: All right. Let the lawyer talk to him and we will see if he needs to come back on Wednesday.
>
> * * *
>
> THE CLERK: People of the State of Illinois versus Theopolis Williams, Caston Rollins.
>
> THE COURT: Mr. [Mark] Williams, apparently they don't need you to come back, so you go back to the Department of Corrections and do your time.
>
> THE WITNESS: I don't know nothing about what they are talking about. I don't know nothing about what they are talking about.
>
> THE COURT: That is why you are not coming back. Good luck to you."

¶ 6    At trial, Granville Payne testified that around 3 p.m. on the day in question, he was standing in his front yard on South Paulina Street with a group of people that included his brother, Louis Payne; his girlfriend, Nancy Williams; and his sister-in-law, Sharlette Williams. Defendant walked up to them and advised them to take "the kids" inside "because it was going to be some shit." Sharlette took several children into the house, but Granville stayed on the porch. Granville noticed defendant speak with codefendant Rollins, and then saw defendant and Rollins enter defendant's house, which was nearby.

¶ 7    At this point, a maroon Chevrolet Monte Carlo pulled up. Sharlette entered the automobile briefly, but then exited and the vehicle drove away. A few minutes later, Granville noticed the vehicle, which was occupied by two people, coming up the block again. Defendant, who was in front of his house, Rollins, who was on defendant's porch, and "somebody in the gangway" started shooting at the vehicle. Granville noticed that defendant had changed into all black clothing and was shooting what looked like a .38 caliber handgun. Rollins was shooting a 9 millimeter or .45 automatic handgun. The person in the gangway, whom Granville could not identify, was shooting "some kind of rifle or something." In all, Granville heard about 11 or 12 shots. Defendant, who chased after the vehicle, fired four or five of those shots. When the shooting stopped, Rollins entered an SUV with two men, defendant entered a small green automobile, and they both drove away. Twelve days later, Granville identified defendant and Rollins in a lineup.

¶ 8    Louis Payne testified that around 3 p.m., he was outside Granville's house with a group of people, including Granville, Sharlette, and Sharlette's children, when defendant came up and told them to "get the baby in the house it is getting ready to be some crap out there or something." Defendant then went to his own house, which was down the street, and commenced "casing back

and forth." Louis noticed a burgundy or maroon Oldsmobile Cutlass drive by twice. The first time, Sharlette entered the automobile and talked with its occupants. When the vehicle came by a second time, defendant and Rollins, who were in front of defendant's house, opened fire on it. Defendant ran toward the street, shooting at the vehicle. Louis could not see what kind of guns were in defendant's and Rollins's hands. When the shooting started, Louis ducked under the porch. On cross-examination, Louis added that he observed a person come out of the gangway when the firing started.

¶ 9    Lashanda Bradley testified that on May 21, 2002, Rollins was her boyfriend. That afternoon, defendant picked her and Rollins up from Rollins' house in a small green vehicle and drove them to defendant's house. While at the house, defendant had a gun in his back pocket, and Rollins had a rifle in his hands. At some point, Bradley heard defendant say, in reference to a vehicle, "If they ride through one more time we're going to get them." Around 3 p.m., when Bradley was in the bathroom, she heard about nine gunshots. They did not sound like they were coming from the same gun. Bradley ran out the back door and did not see defendant or Rollins again.

¶ 10    Jermaine Henderson testified that on the date in question, he owned a burgundy Chevrolet Monte Carlo. At some point that day, a "friend" had driven the vehicle. Later that afternoon, around 3 p.m., he entered the vehicle with his brother and Damon Tyler to go to a restaurant. As he was driving, Henderson saw Rollins reaching over a banister and shooting into the vehicle with a shotgun. Henderson ducked and kept driving, even though he felt his vehicle shaking from the impact of bullets hitting it. He looked in his rearview mirror and noticed defendant following behind him, shooting at the vehicle. The vehicle's back window "came out" and Henderson felt a

bullet hit him. He kept driving and turned a corner, but then stopped. He exited the vehicle, went to the house of someone he knew, and had that person call an ambulance. At the hospital, he was treated for a bullet wound to his back. The bullet was not removed. Henderson indicated that he knew defendant and Rollins from the neighborhood. Twelve days after the shooting, he identified both defendant and Rollins in a lineup at the police station.

¶ 11    On cross-examination, Henderson insisted that he only drove down the street in question one time and denied stopping on the block to allow a woman to enter the automobile. He also testified that there was a third shooter, a man named "Stanley," a couple of houses down the block from the porch where he had seen Rollins. However, later during cross-examination, Henderson testified that he was ducking down while he drove past Stanley and did not actually see Stanley doing any shooting.

¶ 12    Damon Tyler testified that around 3 p.m. on the day in question, he was riding in the back seat of a burgundy Chevrolet Monte Carlo being driven by Jermaine Henderson when he heard shots. Tyler could not tell where the shots were coming from. The vehicle's back window broke and Henderson said he was hit. Henderson continued to drive for a short distance. After he stopped, an ambulance arrived, and Henderson received medical treatment.

¶ 13    On cross-examination, Tyler testified that he had been with Henderson since the morning, that Henderson had not stopped the vehicle to let a woman into it, and that the shooting occurred during the first and only time they drove down that block that day. In response to the court's question regarding how long he and Henderson had been in the vehicle before the shooting took place, Tyler answered, "Sir, we had just entered the vehicle."

¶ 14    Sergio Jacquez testified that on the day in question, when he was six years old, he was outside playing with his friends in an empty lot when he heard a gunshot. He felt something burning in his right leg and fell down. A friend of his mother picked him up and took him to his house. From there, Jacquez was taken to the hospital, where he stayed for two days. In court, Jacquez displayed his injuries, which were about 2 ½ inches above his knee on the front and the back of his right leg.

¶ 15    Chicago police officer Michael Parker, an evidence technician, testified that he recovered multiple 9 millimeter shell casings and 12 gauge shotgun shells from the front porch and front yard of the house on South Paulina Street. He also recovered one shell casing inside the house, near the front door.

¶ 16    Chicago police detective Allen Szudarski testified that on the day of the shooting, he searched a compact green Hyundai that was abandoned with its passenger door open a few blocks from the scene of the shooting. Szudarski found an unloaded .38 caliber revolver and a receipt for auto repair with defendant's name on it.

¶ 17    Defendant and Rollins made motions for directed findings, which were denied by the trial court.

¶ 18    Eric Gibson testified on defendant's behalf. Gibson, who was long-term friends with both Henderson and defendant, stated that around 3 p.m. on the day in question, he was standing on his porch, watching his children ride bicycles. He saw Henderson drive by twice in a red Chevrolet Monte Carlo. During Henderson's second pass through the block, Gibson heard gunshots. He observed Rollins running off a porch a few houses away, shooting a pistol at Henderson's vehicle. Gibson also saw a man he knew as "Stan" running off the same porch with a shotgun in his hand.

Gibson did not see defendant shooting at the automobile and said defendant "was not around during the time of the shooting." On cross-examination, Gibson admitted that he and defendant were currently incarcerated in the "same division," so "I see him all the time."

¶ 19    Sharlette Williams testified that she was standing outside her house around 3 p.m. on the day in question when she witnessed a "gang-related riot." She stated that she noticed two men shooting: "Darin" and "Little Hot." When asked about the location of the shooters by the trial court, Sharlette testified that they had "just jumped out of a burgundy four-door Chevy" and "were standing between the [vacant] lot." On cross-examination, Sharlette agreed that her testimony was that neither defendant nor Rollins "was out there shooting a gun."

¶ 20    Defendant testified that at 3 p.m. on the day of the shooting, he was not at his house on South Paulina Street; he was instead at East 47th Street and South Evans Avenue. On cross-examination, defendant explained that he had the small green Hyundai, which belonged to his family, with him. He also testified that he did not return to his house until two or three days later, when he heard there had been a shooting.

¶ 21    The trial court found both defendant and Rollins guilty of two counts of aggravated battery with a firearm. Defendant filed a motion for a new trial, which the trial court denied. The court subsequently sentenced defendant to concurrent terms of 24 years' imprisonment.

¶ 22    On April 8, 2004, defendant filed a *pro se* motion for reduction of sentence. In support of his motion, he argued, among other things, that "council [*sic*] was ineffective in raising opposing circumstances." In a subsequent proceeding on May 4, 2004, where neither defendant nor his counsel was present, the trial court denied the motion without commenting on the claim of ineffectiveness.

¶ 23    On appeal, defendant contended that the trial court failed to adequately consider his *pro se* claim of ineffective assistance of counsel. This court agreed and remanded for the trial court to assess the merits of the claim. We also ordered correction of the mittimus. *People v. Williams*, No. 1-04-0962 (2005) (unpublished order under Supreme Court Rule 23).

¶ 24    On remand, defendant filed a *pro se* pleading titled "The Defendant's Allegations in Support of his Ineffective Assistance of Counsel Claim." Among his 13 arguments, defendant asserted that trial counsel failed to call Mark Williams as a witness. Defendant attached an affidavit executed by Mark Williams, dated August 2, 2004, which stated as follows:

> "I, Mark Williams, state on oath:
>
> That I can testify to everything that is written in this notarized document. That while Caston Rollions [*sic*] AKA – Big (C) and Theopolis Williams, AKA – (June), had went to jail for shooting the victims. I, Mark Williams, was riding with Angelo Powell, AKA – (Jr.), in his car with Amy Watts and Lashawndra Bralley [*sic*], I, Mark Williams, heard Angelo Powell, tell Amy and Lashawda [*sic*] that when we get to the police station, to tell the police that Caston Rollions [*sic*], did not do the shooting, that Theopolis Williams, did the shooting. When I got back on the block where (June) was staying, because I was staying with him. I asked (June) what happened and he said they was shooting at the Black-Stones AKA – (Moes), and I asked who and he said Angelo and another person that was tall and dark skinned, but, he said he did not know his name. I said who (Big C) and he said no, some dark skinned tall skinny person. He said he did not know his name, but, he thought he was a Black Disciple AKA – (BD) from off the low end.

When we were in Angelo's car, he said leave Theopolis Williams, in there and say he did the shooting. So, they can let Caston Rollions [*sic*] out. The next day I was in Angelo's car, and he told me that 'he shot those people.' "

¶ 25    Defendant also attached an affidavit executed by his sister, Mae L. Day, dated January 24, 2006. In the affidavit, Day averred that on May 20, 2002, she witnessed a crowd of people outside her home on South Paulina Street. She "saw and heard gun shots" and called the police. Day averred that she saw "a group of young men with guns in their hand" in the vacant lot beside her neighbor's house. She stated that she tried to tell the responding police that the young men in the vacant lot were the ones who were shooting at the young men who were on a porch across the street, but they did not listen to her. Day further averred that defendant returned to his home "several hours later," at which time she called him and told him what happened "at the house, between his guest and the young men[.]"

¶ 26    At a hearing on March 24, 2006, the trial court individually addressed the allegations in defendant's *pro se* pleading, including the allegation that trial counsel failed to call Mark Williams. The court found that defense counsel spoke with Mark Williams and chose not to call him. Defendant's trial counsel stated that he thoroughly interviewed Mark Williams, who indicated that he knew nothing about the case and would not testify. The trial court found that an attorney's decision whether to call a witness is a matter of trial strategy and an attorney could have rationally decided not to call Mark Williams. The trial court stated that it conducted a hearing on defendant's "*pro se* motion for a new trial" pursuant to this court's mandate and denied the motion.

¶ 27    On appeal, defendant asserted that the trial court erred in denying his motion because Mark Williams's affidavit presented new evidence of actual innocence and required the court to conduct

an evidentiary hearing on his motion. This court found that the trial court lacked jurisdiction to examine new evidence allegedly demonstrating defendant's actual innocence. Noting that we had remanded for the trial court to examine the ineffective assistance of counsel claim raised in defendant's *pro se* motion for reduction of sentence, we explained that the trial court's jurisdiction was limited to examining that claim. We concluded that a hearing regarding new evidence would have exceeded the scope of our mandate and the trial court's jurisdiction, and, therefore, the trial court did not err by failing to hold an evidentiary hearing. In our order, we also corrected the mittimus. *People v. Williams*, No. 1-06-1424 (2007) (unpublished order under Supreme Court Rule 23).

¶ 28    On July 23, 2013, defendant filed the *pro se* pleading at issue in the instant case, titled "Petition for Post-Conviction Relief Under Actual Innocence." In the petition, defendant argued that Mark Williams's and Mae L. Day's affidavits demonstrated he had been wrongfully convicted, and that the affidavits met the legal standard of what constitutes newly discovered evidence. Defendant asserted that both affidavits were discovered after his 2003 trial: Day's on January 24, 2006, and Mark Williams's on August 2, 2004. Defendant argued that the affidavits were not cumulative to the trial evidence; refuted the testimony of the State's witnesses, who were inconsistent and impeached; and would probably change the result upon retrial. He further asserted that Day's affidavit established an alibi for him and that Mark Williams's affidavit exonerated him, in that it revealed Angelo Powell "was the shooter." Defendant also argued that trial counsel was ineffective for failing to properly investigate his case, "because if these witnesses exist then counsel was ineffective for failing to locate them."

¶ 29    On November 25, 2013, the trial court docketed the petition for second-stage proceedings because it "did *** not get it done within 90 days." Appointed counsel did not amend or supplement the petition. The State filed a motion to dismiss, postconviction counsel filed a response, and the case proceeded to a hearing on September 12, 2016. At the hearing, postconviction counsel stated that she had been unable to locate Mark Williams; had located Angelo Powell, but that he had a pending case on appeal and "indicated that he had nothing to say to our investigators"; and had located Day, but could not add anything to her affidavit. Following argument, the trial court granted the State's motion to dismiss, finding that the petition "has no merit to it whatsoever, no basis for actual innocence or any other basis, ineffective or whatever." Defendant filed a timely notice of appeal the next day.

¶ 30    In cases not involving the death penalty, the Act provides a three-stage process for adjudication. 725 ILCS 5/122-1 *et seq.* (West 2012); *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). The instant case involves the second stage, where counsel is appointed to indigent defendants and the State is allowed to move to dismiss. *Hodges*, 234 Ill. 2d at 10-11. At this stage, all factual allegations that are not positively rebutted by the record are accepted as true. *People v. Hall*, 217 Ill. 2d 324, 334 (2005). The granting of the State's motion to dismiss is warranted if the petition's allegations, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation. *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). In other words, a defendant is entitled to proceed to a third-stage evidentiary hearing on his petition only if the allegations in the petition, supported by the trial record and affidavits or exhibits, make a substantial showing of a violation of constitutional rights. *Id*. at 381. Our review at the second

stage is *de novo*. *Id*. at 388, 389. Pursuant to this standard, we review the trial court's judgment, not the reasons given for it. *People v. Jones*, 399 Ill. App. 3d 341, 359 (2010).

¶ 31    On appeal, defendant contends that his petition made a substantial showing of actual innocence in that it established, via Mark Williams's affidavit, that someone else confessed to the shooting. Defendant argues that the affidavit is newly discovered and could not have been discovered earlier through due diligence, as he acquired it in August 2004, while his case was pending on appeal for the first time. He asserts that he could not have presented the affidavit during a prior proceeding, since this court held that the circuit court lacked jurisdiction to hear an actual innocence claim during the 2006 proceedings on remand. Defendant maintains that the affidavit is non-cumulative, since Angelo Powell's name was never mentioned at trial, and that evidence that another person actually confessed to the shooting is unquestionably material to his guilt or innocence. Finally, defendant argues that the evidence contained in the affidavit would be reasonably likely to change the outcome upon retrial, since the evidence against him was less than overwhelming where the State's witnesses were impeached and inconsistent and no physical evidence connected him to the shooting. He asserts that given the many contradictions between the various witnesses, it would be difficult to find any one particular account so convincing that evidence that someone else confessed to the shooting would not have a significant outcome on the case.

¶ 32    A postconviction petitioner may assert a claim of actual innocence where the claim is based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). Such evidence must be newly discovered, material and not cumulative, and, most importantly, of such conclusive character that it would probably change the result on retrial. *Id.*; *People v. Coleman*, 2013 IL

113307, ¶ 84. Evidence is considered new where it was discovered after trial and could not have been discovered earlier through the exercise of due diligence; material where it is relevant and probative of the petitioner's innocence; noncumulative where it adds to what the jury heard; and conclusive where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The conclusiveness of the evidence is the most important element of an actual innocence claim. *People v. Edwards*, 2012 IL 111711, ¶ 40 (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)).

¶ 33    In this case, we need not address the parties' arguments regarding whether Mark Williams's potential testimony is newly discovered, material, or noncumulative. This is because defendant fails to meet the requirement that the supporting evidence must be so conclusive that, when considered along with the trial evidence, it would probably change the result on retrial. *Coleman*, 2013 IL 113307, ¶¶ 84, 96. Evidence of actual innocence must support total vindication or exoneration, not merely present a reasonable doubt. *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 33; *People v. Green*, 2012 IL App (4th) 101034, ¶ 36.

¶ 34    Here, in his affidavit, Mark Williams averred that sometime after defendant and Rollins had gone to jail for the shooting, he heard Angelo Powell direct Lashanda Bradley and another woman to tell the police that defendant, and not Rollins, "did the shooting" so that Rollins could be released. Mark Williams further averred that the day after this conversation, Powell "told me that 'he shot those people.' " We cannot find that these averments are exonerating.

¶ 35    At best, Mark Williams's affidavit would establish Powell as a shooter at the scene. However, the evidence at trial showed that there were at least two, and possibly three shooters. An evidence technician recovered multiple 9 millimeter shell casings and 12 gauge shotgun shells

from defendant's house, porch, and yard. Granville Payne saw three shooters: defendant, Rollins, and a person shooting from the gangway. Louis Payne saw defendant and Rollins shooting, and saw a third person come out of the gangway when the shooting started. Lashanda Bradley saw defendant and Rollins with guns, and then, while she was in defendant's bathroom, heard about nine gunshots that did not sound like they were coming from the same gun. Jermaine Henderson saw both defendant and Rollins shooting at him while he drove by defendant's house, and saw a third man, "Stanley," a couple of houses down the block. Even defendant's witnesses observed two gunmen: Eric Gibson said he saw Rollins shooting and saw "Stan" with a shotgun, and Sharlette Williams identified two shooters by nickname.

¶ 36     Where the evidence at trial unquestionably established that more than one shooter was involved in the crime, testimony that Angelo Powell confessed that he "shot those people" would not have exonerated defendant. Mark Williams's affidavit, critically, does not indicate that defendant was not one of the shooters. Thus, even if the affidavit is newly discovered, material, and noncumulative, it does not raise the probability that, in light of the new evidence, it is more likely than not that no reasonable trier of fact would have convicted defendant. See *Edwards*, 2012 IL 111711, ¶¶ 39-40 (finding that a co-offender's affidavit stating that the defendant "had nothing to do with this shooting" and was neither "a part [of nor] took part in this crime" was not exonerating because it did not indicate the defendant was not present during the crime). The evidence contained in Mark Williams's affidavit is not so conclusive that, when considered along with the trial evidence, it would probably change the result on retrial. See *Coleman*, 2013 IL 113307, ¶¶ 84, 96.

¶ 37    Defendant's petition did not make a substantial showing of new evidence of actual innocence via Mark Williams's affidavit. Accordingly, we find no error in the trial court's granting of the State's motion to dismiss.

¶ 38    In light of our disposition, we need not address defendant's argument that this case should be assigned to a different judge upon remand because the trial court was not unbiased and impartial.

¶ 39    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 40    Affirmed.