Rule 23 order filed
April 3, 2015;
Motion to publish granted
April 20, 2015.

2015 IL App (5th) 130189

NO. 5-13-0189

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,  ) Appeal from the
                                       ) Circuit Court of
       Plaintiff-Appellee,             ) St. Clair County.
                                       )
v.                                     ) No. 05-CF-1784
                                       )
GARY WINGATE,                          ) Honorable
                                       ) Michael N. Cook,
       Defendant-Appellant.            ) Judge, presiding.
_____

       JUSTICE MOORE delivered the judgment of the court, with opinion.
       Presiding Justice Cates and Justice Stewart concurred in the judgment and opinion.

## OPINION

¶ 1     The defendant, Gary Wingate, appeals the dismissal, by the circuit court of St. Clair County and at the second stage of proceedings, of his petition for postconviction relief. For the following reasons, we affirm.

¶ 2                                    FACTS

¶ 3     The facts necessary to our disposition of this appeal follow. They are derived from this court's review of the record on appeal, as well as from our earlier disposition in this case, in which, on direct appeal, we affirmed the defendant's convictions and his sentence. *People v. Wingate*, No. 5-09-0267 (2010) (unpublished order under Supreme

1

Court Rule 23). As we explained therein, the defendant was charged with first-degree murder, aggravated discharge of a firearm, and aggravated unlawful use of a weapon, all in connection with the shooting death of Darlene Russell on November 1, 2005. The trial court granted the defendant's motion to sever the aggravated-unlawful-use-of-a-weapon charge, and the State elected to proceed on the remaining counts.

¶ 4    Andre Garrett testified at the defendant's jury trial as follows. On November 1, 2005, he was living with his wife, Darlene Russell, at 5204 Caseyville Avenue in Washington Park, Illinois. Garrett saw the defendant, who lived nearby, walking down 52nd Street. Garrett approached the defendant, whom he had known for more than 20 years, to speak with the defendant about some money the defendant owed Russell. As Garrett approached, the defendant raised his fists and began to talk "crazy." Fearing that the defendant would strike him, Garrett punched the defendant, knocking him down. Garrett testified that he was a former amateur boxing champion and that he "never owned a gun, never carried a gun." After knocking down the defendant, Garrett went back into his house. Russell then went to speak with the defendant. Garrett followed her, telling her to come back inside. Garrett saw the defendant in a nearby yard and saw a person he knew as "Torre" (Torrian Hopkins), who had been with the defendant when Garrett punched him, across the street, walking across a field. Garrett urged Hopkins to stop and talk with him, but Hopkins continued walking and said, "I ain't got nothing to do with it."

¶ 5    Garrett then heard a sound he described as "du-du-du-du-du." He turned and saw the defendant on his knees and firing a weapon in Garrett's direction. At first, Garrett thought the defendant was firing blanks, but when he heard gunfire strike his house, he

2

and Russell ran to the house. As Russell was standing on the porch reaching for the door, she was struck and killed by gunfire. The shooting stopped, and when Garrett arrived at the porch, he saw blood on it. Garrett turned and saw the defendant fleeing through an alley carrying "a big rifle."

¶ 6 Keith McNeal testified that on November 1, 2005, he was at the home of his cousin, Bryan Turner, at 1542 North 52nd Street, helping Turner repair an automobile. Just to the south of Turner's house was the house where the defendant stayed. McNeal saw Garrett and the defendant and heard them arguing about money. McNeal went inside to get some tools, and when he came out, he saw the defendant lying on the ground. The defendant got up and said that he was "going to get" Garrett. Turner then sent McNeal to a nearby liquor store to purchase some soft drinks. As McNeal was walking back to Turner's house, he heard the sound of gunfire. As he reached Turner's house, he saw "somebody" walk down the alleyway and turn left onto 49th Street. McNeal could not positively identify the man he saw in the alley, but his height and build were similar to the defendant's.

¶ 7 Bryan Turner testified that he saw Garrett strike the defendant and knock him to the ground. After Garrett left, the defendant got up and walked away. Douglas Scott testified that on November 1, 2005, he was at Turner's house helping Turner and McNeal work on a car. The defendant was outside the house next door. Garrett walked up and the two men began arguing about money. Garrett struck the defendant, knocking him to the ground. Garrett walked away. After about 10 or 15 minutes, the defendant got up and went into his house. Russell came over to Garrett and tried to calm him down. The

3

defendant came out of his house carrying an "AK-47" and went towards the alley. The defendant then began shooting at Garrett. The defendant knelt as he fired. He stood up, walked toward Garrett's house, knelt, and then fired some more. Garrett was running from the defendant, toward his house. Scott saw Russell "laying [*sic*] there." The defendant then ran away, still holding the rifle.

¶ 8    Willie T. Lee testified that on November 1, 2005, he was outside his automobile repair business when he heard the sound of gunfire. Shortly thereafter, Lee saw "[a] black guy" with a rifle coming up the alley towards him. The man turned down a street, walked up three houses, and went into an abandoned building. Lee did not see the man's face clearly but described him as being short, with a stocky build. Dennis Janis, a crime scene investigator with the Illinois State Police, testified that on November 1, 2005, he was directed to the vicinity of Caseyville Avenue and 52nd Street in Washington Park, Illinois. Garrett's house had sustained damage that was "consistent with gunshot damage." Janis recovered "a projectile" from the side door of the house and "a bullet jacket" from a "porch post." Two vehicles near the house had also been damaged by gunfire. Janis recovered "a projectile and a fragment" from one of the vehicles. Janis searched the vicinity around Garrett's house and found a number of "discharged 7.62 cartridge cases." Janis also searched an abandoned house nearby, where he found an "assault rifle" under a mattress. The following day Janis attended Russell's autopsy. The pathologist removed a "jacket and fragment" from Russell's body, which Janis collected and preserved. After the autopsy, Janis returned to the Garrett residence, where he found further gunshot damage inside the kitchen. He also found several bullets and bullet

4

fragments inside the residence.

¶ 9    Benjamin Koch, a crime scene investigator with the Illinois State Police, testified that when he arrived at the crime scene, a detective asked him to help search an abandoned house nearby. In the living room, Koch lifted a mattress off the floor and found an "assault rifle." Koch contacted Janis, who took possession of the rifle. James Hall, a forensic scientist specializing in firearms and tool mark identification, testified that his testing demonstrated that the cartridge cases and the bullet and bullet fragments found at the scene, as well as the bullet fragments recovered from Russell's body, all came from the rifle.

¶ 10   The defendant testified as well, stating that on November 1, 2005, he and his nephew, Torrian Hopkins, were standing outside his house when they were approached by Andre Garrett. The defendant had borrowed money from Russell and was late paying it back. When Garrett asked the defendant if he had Russell's money, the defendant replied that his check had not arrived and that the defendant would pay him as soon as it did. When the defendant looked away briefly, Garrett struck him twice, knocking him down. When he regained consciousness, he got up off the ground. Hopkins was gone and no one else was around. The defendant then walked a few feet to the fence in his yard and grabbed his "assault rifle." The defendant claimed that he retrieved his rifle because Garrett was "a drug dealer" and "a loan shark" who was "known for carrying guns," and the defendant assumed that Garrett "had gone home to get a gun." The defendant had been in Garrett's house before and had seen guns there. As the defendant stood by his fence holding the rifle, he saw Garrett emerge from his house and begin to

5

walk in the defendant's direction. The defendant stepped out into the street to show Garrett that he was armed, but Garrett continued walking toward him. Although the defendant did not see a weapon in Garrett's possession, he began firing at Garrett in order to frighten him. He was not trying to hit Garrett. When the defendant started shooting, Garrett stopped. The defendant then stopped shooting. He saw Garrett "reach[ ] down his side like he was going in his pocket." Suspecting that Garrett was reaching for a weapon and not wanting to wait until Garrett had the weapon in hand, the defendant began firing again. Garrett turned and ran towards his house but stopped and knelt between two vehicles in his driveway. Believing that Garrett was going to start shooting at him, the defendant continued to fire in the direction of the vehicles. At that point, the defendant was trying to hit Garrett but was acting out of fear for his own safety and a desire to defend himself. The defendant did not see Russell at any point during the entire episode. After he stopped shooting, the defendant ran down the alley and to a nearby abandoned house, where he left the assault rifle. He then went to a friend's house in East St. Louis, where police arrested him the following day.

¶ 11    At the conclusion of the trial, the jury was instructed on both self-defense and second-degree murder, under both the serious-provocation prong and the unreasonable-belief prong, as well as first-degree murder and aggravated discharge of a firearm, the two charged offenses. The jury found the defendant guilty of first-degree murder and aggravated discharge of a firearm.

¶ 12    On November 26, 2006, the defendant filed a posttrial motion for a new trial, arguing, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt of

6

the charges. On April 13, 2007, he filed an amended posttrial motion arguing that trial counsel, Karen Craig, had rendered ineffective assistance of counsel for failing to call Torrian Hopkins as a witness because Hopkins could have testified that Garrett was armed with a firearm when he approached the defendant. On March 7, 2008, the defendant filed a second amended posttrial motion, adding an allegation that Craig had rendered ineffective assistance by failing to argue that the defendant was unfit to stand trial. The defendant also filed a petition pursuant to section 104-11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104-11 (West 2006)) requesting the trial court to appoint an expert to examine the defendant and to determine whether the defendant had been fit to stand trial. The trial court appointed Dr. Daniel Cuneo to examine the defendant.

¶ 13    On November 12, 2008, a hearing was held on the defendant's fitness petition and on the ineffective-assistance allegations of his posttrial motion. The defendant testified that he had told Craig that Hopkins had witnessed the incident but that she failed to contact him. The defendant also testified that at the time of the trial he was "hearing voices" and "seeing things" and that he did not understand the nature and purpose of the proceedings against him. The defendant testified that he had asked Craig to request a fitness hearing but that she had not done so. The defendant introduced into evidence the August 31, 2003, reports of Drs. Patel and Bermani, which indicate that the defendant suffers from major depression, and the July 8, 2004, and September 14, 2004, reports of Dr. Katzman, which indicate that the defendant suffers from schizoaffective disorder.

¶ 14    Dr. Cuneo testified that he is a clinical psychologist and has performed between

4,000 and 5,000 fitness examinations. Dr. Cuneo examined the defendant's medical records and interviewed him on several occasions. It was Dr. Cuneo's opinion that the defendant was feigning his reported psychiatric symptoms to avoid prosecution. Dr. Cuneo opined that at the time of his trial the defendant had been able to understand the nature and purpose of the proceedings against him and was able to assist in his own defense.

¶ 15 Defense counsel Karen Craig testified that when she first spoke with the defendant, he had indicated that a person he knew as "Tori" (Torrian Hopkins) had been present during his argument with Garrett but that he did not know "Tori's" last name or address. The defendant also told Craig that Hopkins had already left the scene when the defendant regained consciousness and went to retrieve his rifle. Shortly before trial Craig again spoke with the defendant regarding Hopkins, but the defendant still could not provide her with any more information regarding him. Craig explained that because the defense strategy of self-defense turned on what happened after the defendant had retrieved his rifle and was approached by Garrett the second time, any testimony Hopkins could provide would be of limited value because he had already left the scene by then. Craig further testified that at no time did she observe anything regarding the defendant's demeanor that would lead her to suspect that there was a *bona fide* doubt regarding his fitness to stand trial.

¶ 16 The trial court denied the petition for a fitness determination, finding that the defendant had been fit to stand trial. The trial court also denied the defendant's second amended posttrial motion with respect to the allegations of ineffective assistance of

8

counsel, finding that Craig had not been ineffective for having failed to pursue the Hopkins matter further, given the defendant's inability to demonstrate that Hopkins could have provided any pertinent information.

¶ 17 On February 19, 2009, the defendant filed a third amended posttrial motion, arguing, *inter alia*, that subsequent to his trial and to the filing of his original posttrial motion, he learned of "newly discovered evidence" which would support his claim of self-defense. Specifically, the defendant alleged that Torrian Hopkins would testify that the defendant saw Garrett with a gun prior to shooting at him. Attached to the motion was an affidavit from Hopkins wherein Hopkins averred that after Garrett knocked the defendant to the ground, he went into his house and came back out with a gun in his hand. It was after the defendant saw the gun that he went and got his own rifle and began shooting at Garrett.

¶ 18 A hearing on the defendant's third amended posttrial motion was held on March 12, 2009. Torrian Hopkins testified that on November 1, 2005, he was talking to the defendant when Garrett approached and asked the defendant for the money he owed Russell. The defendant said he did not have it because his check had not arrived. Garrett became angry and told the defendant that he then owed double the amount. When the defendant stated that he would not pay double, Garrett punched him, knocking him down. As Hopkins helped the defendant up, Garrett walked away and went into his house. Hopkins then started walking towards the middle of the street. He saw Garrett coming back out of his house carrying something that appeared to be a gun. As Hopkins continued walking, he heard some gunshots. He then "struck off" across the street. On

9

cross-examination, however, Hopkins stated that he had not seen a gun but had "assumed" that Garrett had a gun and that other people had said that Garrett had a gun. The trial court denied the defendant's third amended posttrial motion, finding that Hopkins's testimony would not lead to a different verdict on a retrial and that the remaining claims did not warrant a new trial.

¶ 19    A sentencing hearing was held on April 20, 2009. The defendant was sentenced to 50 years' imprisonment. The defendant subsequently filed a motion to reconsider his sentence, arguing that for a 46-year-old man, a 50-year sentence was tantamount to a life sentence. The trial court denied the motion, finding that while the possibility of rehabilitation was an important consideration, a 50-year sentence was appropriate given the defendant's criminal history.

¶ 20    After this court affirmed the defendant's convictions and sentence on direct appeal, the defendant, on October 20, 2011, filed *pro se* a petition for postconviction relief. Therein, the defendant claimed that, based upon "newly discovered evidence," he was "actually innocent" of the crimes of which he was convicted. Attached to the petition was the affidavit of one Jeff Mosley, dated April 29, 2011, who averred that he too witnessed the events of November 1, 2005. Mosley averred that he had been conversing with Garrett, that he watched the first encounter between Garrett and the defendant from "about 25 feet away," and that Garrett twice struck the defendant in the face with a silver handgun, knocking the defendant down. Mosley averred that Garrett then walked past Mosley and into Garrett's home. Mosley averred that Mosley "stayed standing there and waiting on him to come back out," and that when Garrett did come back outside, "[a]bout

10

two minutes" later, Garrett did so "with his gun in his hand."  Mosley averred that he observed the defendant "grab a big gun *** and point it in [Garrett's] direction," and that because both men now had guns, Mosley "took cover and continued to watch."  He averred that during this second encounter with the defendant, Garrett raised "his gun in the direction of" the defendant, and that when the defendant then opened fire, Garrett "took off running back towards his house and when he got there he ducked in between his trucks in the driveway."  Mosley did not describe what happened next, nor did he describe the killing of Russell by the defendant.  Mosley further averred that he waited several years to come forward because he was a "close friend" of Garrett and Russell and had "mixed emotions about coming forward."  He also averred, "During all the commotion between [the defendant] and [Garrett] it was impossible for [the defendant] to know I was out there or I had witness [*sic*] what [Garrett] did and attempted to do to [the defendant]."

¶ 21  Counsel was appointed for the defendant and an amended petition for postconviction relief was filed on September 28, 2012.  A second amended petition for postconviction relief was filed by counsel on December 21, 2012 (the petition).  It alleged ineffective assistance of trial counsel, including on the basis of the failure of counsel to locate witness Jeff Mosley prior to trial, and it alleged actual innocence on the basis of Mosley's affidavit, which was again attached to the petition as an exhibit.  The State moved to dismiss the petition, and a hearing was held on the State's motion on March 20, 2013.  At the conclusion of the hearing, the trial court dismissed the petition, and this

11

timely appeal followed.

¶ 22                                    ANALYSIS

¶ 23    On appeal, the defendant contends the petition should have advanced to a third-stage evidentiary hearing because the petition "made a substantial showing that [the defendant] was actually innocent based on Jeff Mosley's affidavit."  He claims "Mosley's affidavit constitute[s] newly discovered evidence because neither [the defendant], nor his attorney, could have discovered that Mosley" was a witness to the events of November 1, 2005.  He also claims that had the jury heard Mosley's version of events, "the result of the trial would have likely been different."  The State counters that the defendant's claim, as supported by Mosley's affidavit: (1) is positively rebutted by the record; (2) does not establish that the defendant is actually innocent; (3) cannot be construed to be newly discovered evidence; and (4) would not probably change the outcome of a new trial.

¶ 24    We begin by noting our standard of review.  When a trial court dismisses a petition for postconviction relief at the second stage of proceedings, we review that dismissal *de novo*, taking as true all well-pleaded facts that are not positively rebutted by the trial record.  *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).  To be entitled to a third-stage evidentiary hearing, a petition for postconviction relief must make "a substantial showing of a violation of constitutional rights." *People v. Coleman*, 183 Ill. 2d 366, 381 (1998).  In Illinois, petitioners may "assert a freestanding claim of actual innocence based on newly discovered evidence." *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009).  The evidence that supports such a claim "must be newly discovered; material and not merely cumulative; and 'of such conclusive character that it would probably change

12

the result on retrial.' " *Id*. (quoting *People v. Morgan*, 212 Ill. 2d 148, 154 (2004)). "Newly discovered" evidence is "evidence that has been discovered since the trial and that the defendant could not have discovered sooner through due diligence." *Id*. at 334. "The focus of a freestanding claim of actual innocence is on the new evidence itself and whether it would totally vindicate or exonerate the defendant." *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 33. Where, as in the case before us, a claim of actual innocence is dismissed at the second stage of proceedings, "the relevant question is 'whether the petitioner has made a substantial showing of actual innocence such that an evidentiary hearing is warranted.' " *Id*. (quoting *People v. Lofton*, 2011 IL App (1st) 100118, ¶ 34). Moreover, "newly discovered evidence 'which merely impeaches a witness' will typically not be of such conclusive character as to justify postconviction relief." *People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007) (quoting *People v. Chew*, 160 Ill. App. 3d 1082, 1086 (1987)); see also *People v. Harris*, 154 Ill. App. 3d 308, 319 (1987) ("Newly discovered evidence which merely has the effect of impeaching, discrediting, or contradicting a witness does not afford a basis for a new trial.").

¶ 25    For the reasons that follow, we affirm the ruling of the trial court. The first reason we affirm is that with regard to the requirement that the newly discovered evidence be of such conclusive character that it would probably change the result on retrial (see *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009)), we agree with the reasoning of the *Barnslater* and *Harris* courts, and conclude that any evidence Mosley might offer, which we take as true for purposes of this appeal, would merely impeach Garrett's testimony that he "never owned a gun, never carried a gun," and thus would not justify postconviction relief. See

13

*People v. Barnslater*, 373 Ill. App. 3d 512, 523 (2007) ("newly discovered evidence 'which merely impeaches a witness' will typically not be of such conclusive character as to justify postconviction relief" (quoting *People v. Chew*, 160 Ill. App. 3d 1082, 1086 (1987))); see also *People v. Harris*, 154 Ill. App. 3d 308, 319 (1987) ("Newly discovered evidence which merely has the effect of impeaching, discrediting, or contradicting a witness does not afford a basis for a new trial."). Therefore, we decline to conclude that Mosley's proffered impeachment testimony is of such *conclusive* character that it would *probably* change the result on retrial. It simply is not.

¶ 26 A second, and independent, reason that we affirm the ruling of the trial court is that we do not agree with the defendant's claim that Mosley's affidavit meets the criteria to be construed as "newly discovered" evidence on the basis of the defendant's bald assertions, in his brief on appeal, that "[t]here was no reason to know of Mosley's presence at the scene *** before Mosley stepped forward several years later" and that "neither [the defendant], nor his attorney, could have discovered that Mosley" was a witness to the events of November 1, 2005. The appellate court has previously ruled that a defendant seeking relief on the basis of newly discovered evidence bears the burden of demonstrating "that there has been no lack of due diligence on his [or her] part." *People v. Harris*, 154 Ill. App. 3d 308, 318 (1987). The appellate court's ruling in *Harris* is consistent with the requirement, discussed above, that for purposes of seeking postconviction relief, "newly discovered" evidence must be "evidence that has been discovered since the trial and that the defendant could not have discovered sooner through due diligence." *People v. Ortiz*, 235 Ill. 2d 319, 334 (2009). In *People v.*

14

*Barnslater*, 373 Ill. App. 3d 512, 525-27 (2007), the appellate court held that a defendant was not entitled to an evidentiary hearing where his petition and accompanying documents, even when taken as true and liberally construed in the defendant's favor at the second stage of proceedings, failed to make a substantial showing that the defendant could not have discovered the purportedly "newly discovered" evidence sooner through due diligence on the defendant's part.

¶ 27    In his affidavit, Mosley claims he waited several years to come forward because he was a "close friend" of Garrett and Russell and had "mixed emotions about coming forward."  Even if this assertion is treated as a statement of fact, and therefore is taken at this point in the proceedings as true, it merely excuses Mosley's failure to come forward sooner on his own accord, and it does not address the question of the due diligence of the defendant in independently discovering Mosley as a witness.  Mosley does not aver that he was unavailable at any time prior to coming forward, and makes no other averment that would allow us to conclude that he would not have offered his affidavit or testimony, if asked, prior to the defendant's trial.  Nor does Mosley make any other averment that would allow us to conclude that he "essentially made himself unavailable as a witness," as did the witness in *Ortiz.*  See 235 Ill. 2d at 334.  Although Mosley speculates in his affidavit, "During all the commotion between [the defendant] and [Garrett] it was impossible for [the defendant] to know I was out there or I had witness [*sic*] what [Garrett] did and attempted to do to [the defendant]," such speculation does not amount to a statement of fact.  To the contrary, it is a nonfactual and nonspecific assertion that amounts to a conclusion; therefore, this court need not treat it as a well-pleaded fact that

15

must be taken as true at this stage of the proceedings and that is sufficient to require an evidentiary hearing in this case. See, *e.g.*, *People v. Rissley*, 206 Ill. 2d 403, 412 (2003).

¶ 28 Indeed, unlike the affidavit in question in *Ortiz,* which demonstrated that the newly discovered witness was standing in a location "where he would not have been seen by [the] defendant" (235 Ill. 2d at 334), Mosley's affidavit contains no such statement of fact. To the contrary, the facts contained within Mosley's affidavit, taken as true, are that he and Garrett were conversing just prior to Garrett's first encounter with the defendant, which Mosley watched from "about 25 feet away." There are no facts in Mosley's narrative that suggest he was in a location where he could not be seen by the defendant−or for that matter by the other witnesses who were interviewed by police and who testified at the defendant's trial−before, during, or after the defendant's first encounter with Garrett, or during the early stages of the defendant's second encounter with Garrett. Moreover, there are no facts that suggest that even when Mosley "took cover and continued to watch" the escalation of the second encounter, he was in a location where he could not be seen by the defendant. Because Mosley's affidavit, even when taken as true and liberally construed in favor of the defendant, contains no statements of fact that would support the contention that the failure to discover Mosley as a witness prior to the defendant's previous trial was not due to a lack of due diligence on the part of the defendant−and therefore because it does not support the contention that its contents constitute newly discovered evidence that warrants an evidentiary hearing−the defendant's argument that the petition should have advanced to an evidentiary hearing because the petition "made a substantial showing that [the defendant] was actually

16

innocent based on Jeff Mosley's affidavit" necessarily fails.

¶ 29    Nevertheless, in the interests of justice, we will consider if any other evidence was presented to the trial court that would demonstrate that the defendant had met his burden of demonstrating due diligence so that Mosley's affidavit could be construed as newly discovered evidence that would constitute a substantial showing of actual innocence sufficient to warrant an evidentiary hearing.  The defendant, in his sworn verification of the petition, swore only that "the facts in this petition are true and correct in substance and in fact."  However, the petition itself, although filed by counsel, contains no facts regarding the defendant's knowledge or lack of knowledge of Mosley's purported witnessing of the shooting, and contains no other facts related to due diligence on the part of the defendant to discover Mosley.  It does not allege, for example, that the defendant did not see Mosley at the scene of the crime, or that for some reason he could not have seen Mosley at the scene of the crime, despite Mosley's averments as to his location as the events unfolded; it does not allege that the defendant did not in fact know that Mosley was at the scene of the crime; it does not allege that none of the other witnesses who were interviewed by police failed to tell the police that Mosley was also at the scene of the crime, and that therefore he could not have learned of Mosley's existence from those witnesses or the police; it does not allege that the defendant did not learn of Mosley's alleged witnessing of the shooting until Mosley came forward with his affidavit.

¶ 30    This is not to imply that all of the foregoing would be necessary to make a substantial showing that the defendant's failure to discover Mosley prior to the defendant's previous trial was not due to a lack of due diligence on the defendant's part.

17

The problem is that neither the petition nor its verification contains *any* facts that would, if taken as true, validate the proposition that the defendant exercised due diligence in this case with regard to discovering Mosley. On the basis of the record before us, we conclude that this is not a case wherein well-pleaded facts, taken as true, merit the proving ground of an evidentiary hearing; to the contrary, this is a case in which there are no facts alleged that, even if true, would entitle the defendant to the relief he seeks. Clearly, even the most liberal construction of an affidavit, petition, or sworn verification cannot create from whole cloth facts that in no way exist therein. Accordingly, we hold that the defendant has not met his burden of demonstrating that Mosley's affidavit is newly discovered evidence that could not have been discovered earlier through due diligence on the part of the defendant; therefore, the defendant did not make a substantial showing of actual innocence sufficient to warrant an evidentiary hearing in this case.

¶ 31    A third, and again independent, reason that we affirm the ruling of the trial court is that to the extent it could potentially reduce the defendant's liability from first-degree murder to second-degree murder, the defendant's proffered evidence does not demonstrate his actual innocence. At oral argument, we asked the parties to thereafter provide supplemental argument and support therefor with regard to the question of whether an actual innocence claim can encompass a situation in which the newly discovered evidence might make the defendant guilty of a lesser offense, but not make the defendant guilty of no crime at all. We have now received the supplemental materials of the parties. The defendant reiterates that it is his position that on retrial, the newly discovered evidence could lead to his complete acquittal, on the basis of self-defense, or

18

to his conviction for the lesser offense of second-degree murder. The defendant posits that with regard to the latter situation, the relevant inquiry is whether a conviction for a lesser offense is a "different outcome" than that of the first trial, and proposes to us that it is. However, we conclude that the relevant inquiry with regard to the latter situation is found within *People v. Barnslater*, 373 Ill. App. 3d 512 (2007).

¶ 32 Like the present case, *Barnslater* involves the dismissal of a defendant's petition for postconviction relief at the second stage of proceedings. *Id.* at 513. In *Barnslater*, our colleagues in the First District discussed claims of actual innocence based on newly discovered evidence. They pointed out that previous decisions of the appellate court make it clear that "actual innocence" refers not to whether a defendant has been proven guilty beyond a reasonable doubt, but instead means "total vindication, or exoneration." (Internal quotation marks omitted.) *Id*. at 520. Accordingly, "actual innocence requires that a defendant be free of liability not only for the crime of conviction, but also of any related offenses." *Id*. at 521.

¶ 33 After reviewing the materials submitted with the defendant's petition for postconviction relief, and construing those materials liberally in the defendant's favor, the *Barnslater* court held that because the purported newly discovered evidence in that case did not demonstrate that the defendant, "even if 'not guilty' of aggravated criminal sexual assault predicated on aggravated kidnaping, is 'actually innocent' of any crime against Y.B., including lesser included offenses of aggravated criminal sexual assault such as simple criminal sexual assault or criminal sexual abuse," the defendant was not entitled to postconviction relief. *Id*. at 526-27. In the case at bar, the defendant argues that

Mosley's testimony, if consistent with his affidavit, "would support the claim of self-defense and would also assist the jury in resolving whether [the defendant] should be found guilty of second degree murder."

¶ 34   To the extent Mosley's proffered testimony could potentially reduce the defendant's liability from first-degree murder to second-degree murder, we conclude that pursuant to *Barnslater*, even if it did so, it would not support a claim of actual innocence. See *id.* at 521 ("actual innocence requires that a defendant be free of liability not only for the crime of conviction, but also of any related offenses"). Accordingly, the defendant has not made a substantial showing of actual innocence on this basis.

¶ 35   To the extent Mosley's proffered testimony could potentially lead to the defendant's complete acquittal, on the basis of self-defense, we conclude that even if we assume, *arguendo*, that the testimony would under those circumstances be exonerating to the extent it could support a claim of actual innocence, that would not assist the defendant in overcoming the infirmities that justify us in affirming the trial court's ruling for the two other independent reasons discussed above.

¶ 36                                    CONCLUSION

¶ 37   For the foregoing reasons, we affirm the dismissal of the defendant's petition for postconviction relief.


¶ 38   Affirmed.

2015 IL App (5th) 130189

NO. 5-13-0189

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

THE PEOPLE OF THE STATE OF ILLINOIS,          )          Appeal from the
                                              )          Circuit Court of
      Plaintiff-Appellee,                     )          St. Clair County.
                                              )
v.                                            )          No. 05-CF-1784
                                              )
GARY WINGATE,                                 )          Honorable
                                              )          Michael N. Cook,
      Defendant-Appellant.                    )          Judge, presiding.
_____

**Rule 23 Order Filed:**          April 3, 2015
**Motion to Publish Granted:**    April 20, 2015
**Opinion Filed:**                April 20, 2015
_____

**Justices:**          Honorable James R. Moore, J.

                       Honorable Judy L. Cates, P.J., and
                       Honorable Bruce D. Stewart, J.,
                       Concur

_____

**Attorneys**          Michael J. Pelletier, State Appellate Defender, Ellen J. Curry, Deputy Defender,
**for**                Dan W. Evers, Assistant Appellate Defender, Fifth Judicial District, 909
**Appellant**          Water Tower Circle, Mt. Vernon, IL 62864

_____

**Attorneys**          Hon. Brendan F. Kelly, State's Attorney, St. Clair County, 10 Public Square,
**for**                Belleville, IL 62220; Patrick Delfino, Director, Stephen E. Norris, Deputy
**Appellee**           Director, Sharon Shanahan, Staff Attorney, Office of the State's Attorneys
                       Appellate Prosecutor, Fifth District Office, 730 E. Illinois Highway 15, Suite
                       2, P.O. Box 2249, Mt. Vernon, IL 62864

_____