2020 IL App (1st) 170573-U

No. 1-17-0573

SIXTH DIVISION
MARCH 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 04 CR 18747 |
| | ) | |
| EMANUEL RIVERA-MARTINEZ, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Mikva and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the affidavit advanced by the defendant in support of his claim of actual innocence is not of such conclusive character that it would probably change the result on retrial, the trial court did not err in denying the defendant leave to file a successive postconviction petition.

¶ 2    The defendant Emanuel Rivera-Martinez, who was convicted of the first-degree murders of two victims and sentenced to natural life imprisonment, appeals from the trial court's denial of leave to file a successive *pro se* postconviction petition. On appeal, the defendant contends that

the trial court erred in denying him leave to file his petition because he presented a colorable claim of actual innocence based on the affidavit of a newly discovered eyewitness. Because we find that the defendant's proffered evidence is not of such conclusive character that it would probably change the result on retrial, we affirm the judgment of the circuit court of Cook County.

¶ 3                                                    BACKGROUND

¶ 4     The defendant's conviction arose from the shooting deaths of Freddy Hurtado and Mario Montanez on November 15, 2003, near the intersection of Lawndale and Fullerton Avenues in Chicago. At the defendant's 2008 bench trial, the defense theory of the case was that the defendant fired his gun in self-defense, as a rival gang member had shot at him first. Due to the nature of the defendant's claim in this appeal, we will set forth the pertinent facts adduced at trial.

¶ 5     Ricardo Gomez testified that around 9 or 9:30 p.m. on the evening in question, he was picked up by Renee Delgado and the two victims, Hurtado and Montanez. Gomez stated that all four of them were unarmed. They drove in Delgado's car to a bar on the corner of Lawndale and Fullerton Avenues. After they parked on Lawndale Avenue, about a quarter of a block south of the bar, they started crossing from the east side of the street to the west side, in a northerly direction. Gomez noticed two men wearing hoodies on the corner across the street from the bar. He did not recognize the men. The men were to Gomez's right and said something to Gomez's group, but Gomez and his group did not answer and continued walking toward the bar. Gomez testified that his group did not engage the two men in any way or make any movements like they were armed.

¶ 6     When Gomez and his group reached the sidewalk, Gomez heard gunshots coming from his left. Hurtado ran but was shot. Montanez was also shot and fell on top of Gomez. Gomez lowered Montanez onto the sidewalk. Gomez saw the shooter, who was a few feet to his left, put a gun into

his pocket and run away. Gomez was able to catch "a glimpse" of the shooter's face. Almost immediately afterwards, Gomez saw a female police officer and pointed her in the direction that the shooter was running. The officer ran after the shooter. Later that evening, Gomez identified the defendant as the shooter in both a photographic and physical lineup at the police station. Gomez also identified the defendant in court.

¶ 7    Amy Gonzales, who was a patron at the bar on the night in question, testified that at approximately 10 p.m., she noticed she had missed some calls on her cell phone. She stepped outside onto Lawndale Avenue so she could hear while she returned the calls. Gonzales noticed two men on the same side of Fullerton Avenue where she stood, but on the other side of Lawndale Avenue. Then Gonzales saw three men walk up. One of them, who was wearing a puffy coat with a fur hood, pulled out a gun and shot three times in a northerly direction, at the two men on the corner. Gonzales did not see anyone else with a gun or hear any other gunshots. She immediately went back into the bar. Later, at the police station, she identified the defendant in a photograph and in a physical lineup as the shooter. She also identified him in court.

¶ 8    On cross-examination, Gonzales specified that when she first saw the defendant, he was walking on Lawndale Avenue, heading toward Fullerton Avenue; and that when he fired his gun, he and the two men with him were standing in the street next to a car. Gonzales was asked to read the police report of the officer who interviewed her at the scene of the shooting. The report reflected that Gonzales had stated that she saw three men exit a gray vehicle, begin shooting, and then flee southbound. Gonzales testified that she did not remember telling the police she saw the men getting out of a car, but she did recall that the defendant was standing next to a gray car. Gonzales agreed that because she went into the bar immediately after the defendant fired his

weapon and it was loud inside the bar, she would not have heard any additional gunshots that may have been fired. She also stated that during the lineup, the defendant was not wearing the coat with the furry hood, but the police did show her the coat later.

¶ 9     Chicago police detective Cathleen Iser was riding in a police vehicle in the vicinity with two other police officers at the time of the shooting. Detective Iser testified that after she heard "several" gunshots, she exited the police car, ran toward the sidewalk and jumped over a man who had fallen down. She saw a man fire a gun, and then she chased him in a southerly direction on Lawndale Avenue. The shooter turned west into the alley. Detective Iser identified herself as a police officer and yelled for him to stop and drop the gun, but the shooter continued running at the T-intersection southward down another alley. Detective Iser saw the shooter throw a gun into the air by a garage. Detective Iser's partners had continued driving the police vehicle and were able to apprehend the shooter in the alley. In court, Detective Iser identified the defendant as the shooter and identified a photograph depicting the garage roof where the gun was recovered. Detective Iser testified that besides the defendant, she did not see anyone else discharge a weapon.

¶ 10     Alejandro Vega testified that he had been convicted in 2001 of possession of a controlled substance with intent to deliver and was charged with two counts of first-degree murder as a co-defendant in this case. Vega made an agreement with the Cook County State's Attorney Office that in exchange for his truthful testimony in the defendant's trial, the State would recommend a sentence of 20 years' imprisonment for one of the murders and the other count of murder would be dropped.

¶ 11     In November 2003, Vega had been a member of the YLO Cobras gang for approximately 11 or 12 years. Vega knew the defendant as a fellow gang member. Vega stated that on the date in

question, he had been "chilling" with Eugenio Lasso and another man, known as Georgie, on Shakespeare Avenue in Chicago. At approximately 10 p.m., the defendant approached Vega and the other two men and requested a gun. The defendant stated that there were some members of a rival gang, the Imperial Gangsters, on the corner of Fullerton and Lawndale Avenues and the defendant said that he wanted to "[g]et rid of them." Vega testified that the defendant asked him to "[w]atch his back." Vega stated that the defendant had been shot at in the past by a member of the Imperial Gangsters.

¶ 12    Lasso went to his vehicle, retrieved a gun, and gave it to the defendant. The four of them then started walking toward Lawndale and Fullerton Avenues. Vega and Lasso were on the east side of Lawndale Avenue walking north and were planning to "[l]ook out for the police." The defendant was on the west side of Lawndale Avenue near the bar. Georgie had stopped at Lawndale and Belden Avenues, south of Fullerton Avenue. Lasso walked all the way to Fullerton Avenue, but Vega only walked to the alley before Fullerton Avenue when he saw some men exit a car and signal a YLO Cobra gang sign directed at him. Vega testified that he did not know the men. He did not recognize them as members of the YLO Cobra gang, so he thought they were actually "false flagging" the Cobra sign. Vega then heard two or three gunshots and saw the defendant firing the gun at the men who had just exited the car. Vega started running southward on Lawndale Avenue. As he was running, Vega heard "a lot" of gunshots and he looked to see a man in all black, someone he could not identify, in the corner of the alley shooting a gun. Vega could feel bullets passing him.

¶ 13    During his testimony, Vega was shown a photograph of the gun recovered by the police and identified it as the gun that Lasso had in his vehicle that night, which he explained belonged

to the YLO Cobra gang. Vega also identified the coat that the defendant was wearing the night of the shooting. Vega admitted that he was going to plead guilty to a possession of a controlled substance with intent to deliver charge and he would receive a sentence of six years' imprisonment concurrent with his murder sentence. Further, he had been convicted of possession of a stolen motor vehicle and aggravated discharge of a firearm in the past. On cross-examination, Vega admitted that in his recorded statement, he did not mention that there were bullets whizzing by his head or that someone was shooting at him.

¶ 14    The parties stipulated to the photographs taken at the scene, the forensics done on the recovered gun, and the bullets, casings, and metal fragments recovered from the area. Six shell casings were found from the street on Lawndale Avenue south of Fullerton Avenue, four shell casings were found on the sidewalk on Lawndale Avenue south of Fullerton Avenue, and three bullet fragments were recovered in front of 3700 and 3702 Fullerton Avenue, on the northwest corner of the intersection with Lawndale Avenue. Two of the shell casings and one of the bullet fragments were determined to have been fired from the recovered gun. The six shell casings found in the street were all fired from the same firearm and could not be identified or eliminated as having been fired from the recovered gun. The gun contained seven 9 millimeter rounds in its magazine and one 9 millimeter round in its chamber when it was found, and its magazine had a capacity for 12 rounds. A post-mortem examination report stated that Montanez's cause of death was a gunshot wound, that one bullet entered and exited his body, and that one bullet was recovered from his body. The bullet found in Montanez's body was tested and found to have been fired by the recovered gun. Hurtado's autopsy revealed an entrance and exit bullet wound, which caused his death. Only a calcified bullet from a previous wound was recovered from Hurtado's body.

¶ 15    The defendant testified that on the date in question, he took the bus from his mother's residence to go see his girlfriend and newborn son, who lived on Lawndale Avenue, two blocks south of Fullerton Avenue. The defendant got off the bus on the southwest corner of Fullerton and Lawndale Avenues and started walking south on Lawndale Avenue. On his left, he saw two men, one of whom he recognized from the streets and later learned was nicknamed Puppet G. Puppet G. yelled out, "Security, bust out that bitch ass n*gger G. He a Cobra." The defendant, who was in the gang YLO Cobras, knew Puppet G. as a rival Imperial Gangster. The defendant took Puppet G.'s statement to mean that Puppet G. had asked someone to shoot him. The defendant looked around and saw some men exit a gray vehicle that was parked on the corner. When one of the men started shooting at him, the defendant took cover behind a different car parked on the street, took out his gun, and returned fire northbound on Lawndale Avenue "in self-defense." The defendant stated that he did not shoot at the gray car, but rather, "at the guy that was shooting at me." And that although there were "a lot" of bullets coming his direction, he only fired his own gun two or three times. The defendant testified that he had received the gun from his brother as a gift, and that he had not seen Vega or Lasso at all that day. The defendant acknowledged that he had three felony convictions and often carried a gun for protection.

¶ 16    After the defendant stopped shooting, he noticed a female police officer exiting a police vehicle. He started running down the street into an alley where she pursued him and yelled to him to drop his gun. He threw the gun onto the roof of a garage, kept running, and put his hands into the air. He was then apprehended by the police. The defendant stated that he had no intention of killing anyone that day and was merely defending himself. On cross-examination, the defendant stated he did not know how many men exited the gray car before the shooting started.

¶ 17    At the conclusion of the trial, the trial court found the defendant guilty of two counts of first-degree murder. It found the testimony of Gonzales, Gomez, and Detective Iser credible in that their version of the facts suggested it was the defendant who fired first. Further, the trial court noted that the ballistics showed one victim was killed with a bullet from the defendant's gun and that the other victim suffered a through and through bullet wound. The court commented that although Vega was not necessarily the most credible of witnesses because of his background, he was credible when he testified that he, the defendant, and Lasso were looking for rival gang members to seek retaliation. The court admitted there were some questions raised regarding the number of shell casings found at the scene but found that the State had nonetheless proved the defendant guilty beyond a reasonable doubt.

¶ 18    The defendant filed a motion for a new trial, which the trial court denied. The trial court subsequently sentenced the defendant to a term of natural life imprisonment.

¶ 19    On direct appeal, the defendant contended that: (1) the State failed to prove beyond a reasonable doubt that he was not justified in shooting the victims in self-defense; and (2) his conviction should be reduced to second-degree murder based upon his belief that he needed to use deadly force in self-defense. We rejected the defendant's contentions and affirmed. *People v. Rivera-Martinez*, No. 1-08-3583 (2011) (unpublished order under Supreme Court Rule 23).

¶ 20    In 2013, the defendant filed a *pro se* petition seeking relief under the Postconviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). The defendant alleged in the petition that his trial counsel was ineffective for failing to interview and call a witness, Jorge Gonzalez, to refute testimony that was used to convict him. The trial court summarily dismissed that petition, and this court affirmed. *People v. Rivera-Martinez*, 2016 IL App (1st) 133642-U.

¶ 21    In 2015, during the pendency of the appeal of his initial postconviction petition, the defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure. 735 ILCS 5/2-1401 (West 2014). In the petition, the defendant argued that the State did not disclose to the defense that the judge who presided at his trial was a defendant in a civil proceeding alleging the coercion of a false confession in another individual's criminal case. The defendant contended that the trial judge should have recused himself in the defendant's case and that, had he known of the allegations against the trial judge, he would not have waived his right to a jury trial. The trial court dismissed the defendant's petition and denied reconsideration. On appeal, we granted counsel's motion to withdraw and affirmed. *People v. Rivera-Martinez*, No. 1-16-1675 (2018) (unpublished summary order under Supreme Court Rule 23(c)).

¶ 22    On November 22, 2016, while the appeal from his section 2-1401 petition was pending, the defendant filed the operative *pro se* pleading at issue, titled, "Petition for Leave to File Petition for Successive Post-Conviction Relief," which was accompanied by a successive petition raising six issues. Relevant here, the defendant made a claim of actual innocence based on newly discovered evidence, *i.e.*, an attached notarized affidavit from Jesus Rodriguez. According to the defendant, Rodriguez's affidavit exonerated him of first-degree murder and supported his claim of self-defense.

¶ 23    In his affidavit, Rodriguez averred that around 10:15 p.m. on the night of the shooting, he was walking on Fullerton Avenue near the intersection with Lawndale Avenue. He heard multiple gunshots, looked in the direction of the sound, and saw a man in a white hoodie "standing in the middle of the street shooting southbound on Lawndale." Rodriguez stated that the shooter then ran north on Lawndale Avenue, turned west onto Fullerton Avenue, and went into a banquet hall.

Rodriguez then saw a female police officer get out of a police vehicle and run southbound on Lawndale Avenue. He quickly walked away from the scene. Years later, Rodriguez met the defendant "while in the yard" in prison and found out he was "the guy who got imprisoned for the shooting" that he saw. Rodriguez told the defendant what he saw that night and agreed to provide a sworn affidavit.

¶ 24    The trial court denied the defendant leave to file the successive petition. This appeal followed.

¶ 25                                ANALYSIS

¶ 26    We note that we have jurisdiction to hear this appeal, as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 27    On appeal, the defendant contends that his petition sufficiently stated a colorable claim of actual innocence based on newly discovered evidence. He argues that the evidence showing that he intentionally shot the victims was not overwhelming, and that Rodriguez's affidavit bolsters his self-defense claim in that it supports his own trial testimony and helps explain the "confusing" ballistics evidence. The defendant maintains that Rodriguez's testimony could have tipped the balance in his favor, "either through an acquittal or a finding of second-degree murder." He argues that Rodriguez's affidavit:  is newly discovered because he could not have discovered Rodriguez's existence any earlier; is material because it corroborates his testimony that a man shot at him first; is noncumulative because it would "provide the jury with evidence of a completely different character" than his own testimony and would contradict the State's theory of the case; and is sufficiently conclusive to warrant a new trial because it provides evidence of a second shooter and thus is "corroborative evidence of [his] innocence" and his self-defense claim.

¶ 28 The Act contemplates the filing of only one postconviction proceeding. *People v. Edwards*, 2012 IL 111711, ¶ 22. However, our supreme court has provided two bases upon which the bar against successive proceedings may be relaxed. *Id.* The first basis is when a defendant establishes "cause and prejudice" for failing to raise the claim earlier. *Id.* The second is the "fundamental miscarriage of justice" exception, under which the defendant must show actual innocence. *Id.* ¶ 23. When a defendant claims actual innocence, the question is whether his petition and supporting documentation set forth a colorable claim; that is, whether they raise the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Id.* ¶¶ 24, 31, 33. The evidence supporting the claim of actual innocence must be (1) newly discovered; (2) material and not merely cumulative; and (3) of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 32. The conclusiveness of the evidence is the most important element of an actual innocence claim. *People v. Sanders*, 2016 IL 118123, ¶ 47. We review the denial of leave to file a successive postconviction petition *de novo*. *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 29 As an initial matter, we reject the defendant's assertion that he should have been allowed to file a successive petition because Rodriguez's potential testimony could have tipped or shifted the balance of evidence in his favor toward a finding of second-degree murder. In the context of a postconviction claim of actual innocence based on newly discovered evidence, "actual innocence" means " 'total vindication, or exoneration *** [and] requires that a defendant be free of liability not only for the crime of conviction, but also of any related offenses.' " *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 32 (quoting *People v. Barnslater*, 373 Ill. App. 3d 512, 520, 521 (2007)). A claim of second-degree murder does not constitute a claim of actual innocence. *People v. Moore*,

2018 IL App (3d) 160271, ¶ 20. Thus, to the extent that Rodriguez's proffered testimony could potentially reduce the defendant's liability from first-degree murder to second-degree murder, it would not support a claim of actual innocence. *Id.*; *Wingate*, 2015 IL App (5th) 130189, ¶ 34.

¶ 30    With regard to the defendant's claim that Rodriguez's affidavit could potentially lead to a complete acquittal on the basis of self-defense, we find that the affidavit is not of such conclusive character that it would probably change the result on retrial. To establish the affirmative defense of self-defense, the defendant would be required to show, *inter alia*, that he was not the initial aggressor. *People v. Lee*, 213 Ill. 2d 218, 225 (2004) (elements of self-defense are "(1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable").

¶ 31    In his affidavit, Rodriguez stated that he heard multiple gunshots, looked in the direction of the sound, and saw a man in a white hoodie "standing in the middle of the street shooting southbound on Lawndale." Given the undisputed evidence at trial that the defendant was wearing a puffy coat with a fur hood and fired shots in a northerly direction, at best, Rodriguez's averments would show that the defendant was not the only shooter at the intersection that night. However, Rodriguez's statements have no bearing on whether the defendant was the initial aggressor.

¶ 32    Gomez and Gonzales, who were both at the scene prior to the shooting, did not see anyone other than the defendant shooting a gun, much less shooting before the defendant opened fire. Vega testified that the defendant went to the corner in question to "[g]et rid of" rival gang members and fired the first shots in what ended up being an exchange of gunfire. The defendant was the

only witness to identify a different person as the initial shooter that night. The trial court chose to believe the State's witnesses over the defendant with regard to who was the aggressor. Rodriguez's proffered testimony would do nothing to change that determination. Under these facts and circumstances, we find that Rodriguez's potential testimony is not of such conclusive character that it would probably change the result on retrial. See *People v. Jarrett*, 399 Ill. App. 3d 715, 724 (2010) (where affidavits did not dispute that codefendant fired the first shots, they did not support successive postconviction claim of self-defense and were not of conclusive character).

¶ 33    Rodriguez's affidavit does not raise the probability that, if his testimony had been presented at trial, it is more likely than not that no reasonable trier of fact would have convicted the defendant. See *Edwards*, 2012 IL 111711, ¶ 40. Because the affidavit is not of such conclusive character that it would probably change the result on retrial, the defendant has failed to assert a colorable claim of actual innocence. See *id.* ¶¶ 40-41. In light of our determination regarding the conclusiveness of the evidence provided in Rodriguez's affidavit, we need not determine whether it was newly discovered or material. *Sanders*, 2016 IL 118123, ¶ 47. Accordingly, the trial court did not err in denying the defendant leave to file his successive postconviction petition.

¶ 34                                    CONCLUSION

¶ 35    For the reasons explained above, we affirm the judgment of the circuit court of Cook County.

¶ 36    Affirmed.